COLD METAL PROCESS CO. v. Mc-LOUTH STEEL CORPORATION (NATIONAL BANK OF DETROIT et al., Garnishees).

No. 1686.

District Court, E. D. Michigan, S. D.

Oct. 1, 1931.

Butzel, Eaman, Long, Gust & Bills, of Detroit, Mich., for plaintiff.

William B. Cudlip and T. Donald Wade, both of Detroit, Mich., for defendant.

PICARD, District Judge.

Plaintiff brings action against defendant to recover royalties for the use of two distinct types of steel rolling mills. There are really two causes in one, but both are covered by a contract of sale coupled with a license agreement first entered into in April, 1934, which contract embodied an improvement upon a theory of steel rolling in what the art terms a "hot rolling mill" and also the cold rolling of steel without.intermediate annealing.

Previous to 1934 McLouth, president and chief stockholder of defendant, had been a steel salesman but learning that he was interested in forming a steel rolling mill company, plaintiff represented that it had practically completed its experimenting with a hot steel rolling mill at the Youngstown Sheet & Tube Company of Youngstown, Ohio. Later, by agreement, plaintiff installed its hot steel rolling mill in defendant's plant, Detroit, under its (plaintiff's) supervision, advancing part of the cost which was repaid by the McLouth Steel Corporation later and over a period of years. Plaintiff bases its patent No. 1,779,195 (hereinafter referred to as 195) upon the application of one Steckel, but there was a competing petition filed by the United Engineering and Foundry Company—the controversy resulting in a contract between United and plaintiff whereby United withdrew its application and upon the patent being granted to plaintiff, United was given the license to make, use, and sell this patented mill. Plaintiff reserved the right to sell mills to others.

The contract between defendant and plaintiff provided, Section II(h), that defendant was not to pay a royalty greater than anyone else paid for the use of similarly licensed mills with the single exception of Youngstown as covered in Youngstown's 1929 agreement with plaintiff. Youngstown had a better rate of royalty and conditions. However, at the time plaintiff entered into the contract with defendant, there were two other agreements between Youngstown and plaintiff not excluded from the McLouth covenants.

It is well to note that the McLouth agreement of 1934 contained this provision: "Cold Metal agrees, however, that in the granting of any further license to the Youngstown Sheet & Tube Co. the provisions of this paragraph shall be operative and that it will not enlarge the scope of said license dated December 10, 1929, at terms more favorable than those herein established without extending such terms to McLouth."

While the plaintiff-Youngstown agreement of 1934, allegedly not known to defendant, had these two paragraphs:

"Sec. II(g) in the event that results compare unfavorably with the results being secured by competitors of Youngstown who are using 'continuous hot rolling mills', the parties shall review the royalties hereunder as to low carbon steel only, and any reductions which the circumstances warrant shall be made in Youngstown's favor. . . . If, however, the parties disagree then the request of Youngstown shall be submitted to arbitration. * * *

"(i) In the event that Cold Metal shall, at any time during the time of this agreement, grant to another licensee in the United States for the hot rolling of low carbon steel, or for the hot rolling of any other steel covered by this agreement, a more favorable rate than the royalty rates herein required, * * * the royalty rates for this license shall, at the same time, be reduced to said more favorable rates." * * *

The parties are at variance as to whether defendant knew concerning the 1934 contract between Youngstown and plaintiff before 1941. This will be further discussed in the opinion.

Defendant claims that in entering upon its 1934 agreement it relied on plaintiff's representations that the hot rolling mill was ready to produce commercial steel and that it didn't know the mill to be still in experimentation. But this court is convinced that if defendant didn't know it, it should have. Defendant had plenty of opportunity to see the mill in operation. In any event, at the end of three years the parties made the hot steel rolling mill work —at least, to the satisfaction of defendant, so that in 1937 a new contract superseding the 1934 agreement was entered into by which defendant was relieved of certain obligations including exemption from paying past royalties. From that time the hot mill has, with some slight changes and additional expenditures by McLouth, apparently worked satisfactorily. The hot rolling mill has been operated by McLouth at a very substantial profit and up to June 1, 1939, defendant paid royalties as agreed although the claim is now again made that the steel obtainable from the hot rolling mill is not commercial, particularly when

compared with hot rolled steel from "continuous hot rolling mills". This simply means that the finished product from a series of hot rolling mills is much better than that from a single reversing mill where the slab must pass back and forth through the mill at least five times. Defendant, however, has some very substantial customers who use its hot rolled steel in parts of automobiles, furniture, and other equipment not visible in the finished product.

Defendant also denies plaintiff's right to collect royalties on the Cold Rolled Steel Mill. Plaintiff's process of rolling cold steel lies in the combination of its patent 195, which is the mill manufactured by United, coupled with its 1,744,016 patent (hereinafter referred to as 016) and results in a finished grade of steel by running what had been hot rolled steel through the cold rolled steel mill but without intermediate annealing. While other cold rolled steel mills, producing competitive commercial steel, provide for the annealing of the hot rolled steel, in the plaintiff's combination now used by defendant, the sheet steel is run from one spool (016) through rolls upon which power is exerted (195) to wind itself upon another spool or coil (016) which according to plaintiff pulls the steel through the mill. It is because of the receiving coils exerting a tension in the mill as operated that the steel is lengthened but not widened, is made thinner and is more commercial for finer steel work. It is admitted that the "pulling spool" exerts a tension on the steel of between 28 and 42 percent with about 72 percent by the power rolls of mill 195, and that the cold roll steel mill will function without the receiving spool. However, in this event the steel would just run out on the floor in an inferior or wrinkled condition. Defendant states that the function of the second spool of the operation as installed is simply that of a receiving roll.

Defendant had contracted to buy its cold mill from plaintiff but bought it through United with permission from plaintiff, paying $10,000 to plaintiff for that privilege—the purchased cold mill (016 and 195) to be subject to the license agreement of 1934 which obligated defendant to pay royalties.

Defendant claims:

First, that the agreement of April, 1934, renewed with mutual releases in 1937, being an out and out sale of both the hot and cold rolling mills to defendant with an attached agreement providing for royalties in addition, is void. It contends that unconditional title to a piece of property includes the right to use the same without further payments;

Second, that in any event, it should have the benefit of the conditions attached to the Youngstown 1934 contract as to the hot mill because of the "favored nation" clause contained in its own contract with plaintiff; that since the steel defendant's hot rolling mill produces is not comparable to that obtained by competitors having "continuous mills" there should be "arbitration". Defendant contends that the yardstick applied to the plaintiff-Carnegie Illinois agreement (Exhibit on file) should be applied under subsection (i) above, by which plaintiff would be obliged to return to defendant about $70,000 already overpaid for a "paid up" license;

Third, as to the cold mill it adds that plaintiff could only recover from defendant if the amount of pull on the steel was greater than the power exerted by the rolls of the cold mill; and

Fourth, defendant contends that patent 016 is necessary for the proper functioning of 195 and that therefore plaintiff cannot be expected to receive royalties on a machine which it sold to defendant but which will not accomplish the desired results without attaching another patented article.

Defendant demands return of its $10,-000.

The first question for this court to decide is whether the contract requiring payment of royalties is an enforcible one under our decisions or whether defendant having purchased the mill outright (on its theory) is exempted from further royalties.

Defendant contends that requiring it to pay royalties would be an infringement upon the use of the article purchased, and cites a number of cases supporting this position among them: Bauer & Cie v. O'Donnell, 229 U.S. 1, 33 S.Ct. 616, 57 L. Ed. 1041, 50 L.R.A.,N.S., 1185, Ann.Cas. 1915A, 150; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A.1917E, 1196, Ann. Cas.1918A, 955; Boston Store v. American

Graphophone Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann.Cas.1918C, 447; United States v. United Shoe Machinery Co., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968. All of these cases hold that where an outright sale of a patented article is made there can be no further restriction on its use. But we do not believe that these cases have any application here. It must be remembered that there is some doubt as to whether plaintiff sold the hot mill to defendant. At least it was a restricted sale governed by the special contract between plaintiff and defendant. In truth the mill was built right at defendant's plant and then paid for by it. Clearly no profit on the sale of the mill (if it is a sale) went to plaintiff and we believe that this is an important point. But even though we treat the transaction as an outright sale, still the court has been shown no authority where royalties cannot be made part of the sale price. To pay royalties is not a restriction on "use" such as in Motion Picture Patents Co. v. Universal Film Mfg. Co., supra, where a certain film had to be used in connection with the patented machine sold. Or where, as in most of the cases on this point, certain unpatented articles had to be used in connection with the patented article sold. Our supreme court has generally frowned on this latter arrangement and curtailment as an unnecessary and unwarranted restriction on the use of the patented article far and above the protection intended by the patent laws. But we do not believe the supreme court has overruled the doctrine laid down in Porter Needle Co. v. National Needle Co., C.C., 17 F. 536, in Wortendyke v. White, C.C. D.N.J., Fed.Case No. 18,050 nor in Schnack v. Applied Arts Corp., 283 Mich. 434, 278 N.W. 117 and where a patented article is sold on condition that royalties be paid, we see nothing in the decisions that prevents such a contract.

■ In our opinion the original contract of April, 1934, plus the contract of January 12, 1937, are both valid contracts binding upon the parties and we add that by January, 1937, any mis-representation of the hot mill by plaintiff to defendant had come to light. If defendant had been defrauded in 1934—which this court denies—this was cured by the 1937 contract when the parties mutually released each other of past mis-deeds, if any, and defendant agreed that royalties were to start from that time.

## Hot Mill

However, the hot mill presents another issue. The 1934 agreement between plaintiff and defendant included the "favored nation" clause, hereinbefore referred to, exempting therefrom the royalty rates as they existed between Youngstown and plaintiff in their 1929 contract. But the 1934 plaintiff-defendant agreement did not mention the 1934 contract between plaintiff and Youngstown and there is no definite evidence that McLouth knew that any plaintiff-Youngstown 1934 contract had been entered into and that he was aware of its terms. But whether McLouth knew it or not is immaterial because the 1934 Youngstown contract had the provision quoted above for "arbitration" in the event that low carbon steel rolled from the hot mill purchased by defendant, which was the single reversible type, did not compare favorably with that produced from "continuous" hot rolling mills.

The guarantee contained in the plaintiff-defendant contract didn't supply this deficiency because there is nothing in the guarantee that permitted defendant to compare its product with that obtained from continuous mills and we believe that defendant is entitled to the benefits of the 1934 Youngstown provision. Surely if such a clause had been written into some other contract which plaintiff had made defendant would have been entitled to its benefits. In addition the court is unable to accept the construction of the 1934 contract placed upon it by plaintiff that this should only apply if defendant had rolled 100,000 tons a year since neither party anticipated defendant was going to roll anything like that amount.

It must be remembered that the 1929 Youngstown agreement did not place hot reversing mills in an equal or competitive position with hot continuous mills. That was new in the 1934 agreement. It is undisputed that results obtained on the defendant's hot reversing mill do not compare favorably with those obtained from hot continuous mills, and yet defendant is expected to compete with such output on its entire production of hot strip.

■ This court holds that defendant is entitled to such reduction in royalty rates as the operation of its mills and the quality and surface of the steel may warrant and as the rates given to other licensees may entitle it to in order to place

it upon an equal and competitive basis with other producers. If the parties are unable to agree on royalty rates from 1937 and for the future within a reasonable time after this opinion is filed, we will either appoint an arbitrator or refer the matter to a Special Master to recommend to this court what defendant's rate of royalty should be. In making such a determination the Master will be instructed to consider all factors and to take into consideration the contract between plaintiff and Carnegie-Illinois Steel Corporation, not as a yardstick, but to arrive at a fair royalty —taking into consideration all elements. Defendant's liability should be determined by the expiration date of the controlling patent No. 1,977,214.

■ Defendant's contention that paragraph II(h) of its license agreement should be reformed is denied by the court. We hold that any basis for such claim was released by virtue of the agreement between the parties entered into on January 12, 1937.

### Cold Mill

■ By its 1934 contract, defendant was to purchase its cold mills from plaintiff. It was entitled to an all-pull mill—that is, a mill where the strip is pulled through the rolls and where if the pulling stopped the power exerted on the strip by the rolls alone would not be sufficient to move the strip through. Then in 1937 when it wanted a cold strip mill right away it selected a combination of the United Cold Mill, Patent 195, and a part pull mill as described in Patent 016, agreeing to pay royalties on the combined mill as then constructed in accordance with the license agreement. As stated herein, the receiving roll of the cold strip mill exerts a pull on the strip steel of from 28 to 42 percent, less than half, and according to defendant's interpretation of the decision in Cold Metal Process Co. v. American Sheet & Tin Plate Co. et al., D.C., 22 F.Supp. 75, by Judge Fake, such a combination being common to the art, plaintiff would not be entitled to a royalty on any pull mill unless 51 percent of the power was exerted by the pull. In Cold Metal Process Co. v. Carnegie-Illinois Steel Corporation, 3 Cir., 108 F.2d 322 both the 016 and 195 patents were held valid and a comprehensive opinion expressing the workings of various types of mills made. This case was an appeal of the American Sheet & Tin Plate Company citation above. Later the entire matter became a moot question, Cold Metal Process Co. v. Carnegie-Illinois Steel Corp. et al., 3 Cir., 115 F.2d 33, and Judge Fake's deductions are helpful merely inasmuch as his reasoning might influence our decision. It is true as defendant contends that plaintiff's patent at one time claimed that the "principal" power came through the pulling coils but claims No. 24, 25 and 26 of Patent 016 were substituted and now the claim is simply that the power comes "largely" from the pull. "Principal" would mean more than 51 per cent but "largely" would mean a substantial power and 28 to 42 percent certainly would be substantial. It appears to this court that although others may have made similar claims in prior patents and working mills evidently the Steckel patent of 016 coupled with 195 did produce a merchantable steel acceptable to defendant. The Steckel's mill worked where other mills making the same claims did not. We therefore cannot agree with defendant's contention that the mill as constructed does not come under 016.

■ We also must disagree with defendant's position that it is exempt from paying royalty because 016 was necessary to the proper functioning of 195 and that this was purchased as one mill. United never claimed any rights in 016. Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir., 107 F.2d 27.

McLouth got the right to buy a cold mill other than as provided in the 1934 contract. He could have purchased 195 mill alone, and then probably been exempt from royalties, but he wanted a finished piece of steel —unwrinkled and deemed the 016 and 195 mill combination the proper one. Defendant had the benefit of his own attorneys before entering into the contract—this made at the suggestion of plaintiff, because of pending litigation and differences between plaintiff and United involving at least patent 195. Defendant knew of this litigation and these differences and entered into this agreement with all the facts in its possession.

It was the purpose and intent of the parties as expressed in the supplemental agreement of June 25, 1937, that the cold mill should be used under the license agreement. This agreement was ratified and confirmed by the supplemental contract, by defendant's letter of April 8, 1938 (Exhibit on file), and by defendant's own prospectus to the public dated July 29th, 1937 where it extolled the virtues of both the hot and

cold rolled mills announcing in black and white that the company had agreed to pay plaintiff monthly royalties "on both the hot and cold rolled strip steel". The supplemental agreement was entered into in reliance upon the license agreement, plaintiff expecting and intending to receive royalties while defendant expected and intended to pay royalties.

So whether we decide this case on contract or patent law, and in the latter must construe the scope of Patent 016, we arrive at the same result. We hold that with the exception of the advantages of the 1934 Youngstown contract to which we hold defendant is entitled, defendant is bound by the contract as entered into and must pay royalties on both the hot and cold mills.

A decree as covered by this opinion may be submitted for our signature.