## L. A. YOUNG SPRING & WIRE CORP. *v.* FALLS.

1. APPEAL AND ERROR—ACCOUNTING—TRUST EX MALEFICIO—DE NOVO REVIEW.

On appeal in suit for an accounting and to hold several defendants as trustees *ex maleficio* of certain patents and the royalty proceeds therefrom, the Supreme Court considers the case *de novo.*

2. COURTS—JURISDICTION—TRUSTS EX MALEFICIO—PATENTS.

A State court has jurisdiction of a suit to declare a trust *ex maleficio* even though incidental thereto a question arises under the patent law.

3. PLEADING—AMENDMENT—EVIDENCE.

Amendments of pleadings to correspond with the proofs did not state a new cause of action where substantially the same testimony would support both the theories of recovery in the pleadings before and after amendment (3 Comp. Laws 1929, § 14144).

4. SAME—AMENDMENT—CONSTRUCTION OF STATUTES.

The statute authorizing a court to permit the amendment of process, pleading or proceeding either in form or substance for the furtherance of justice at any time before judgment or decree is broad and is to be liberally construed (3 Comp. Laws 1929, § 14144).

5. SAME—AMENDMENT—CORPORATIONS—ACCOUNTING—DISCRETION OF COURT.

In corporation's suit for accounting by some of its high-salaried executive officers and to hold them as trustees *ex maleficio* of certain patents and royalties therefrom where trial court, at conclusion of all the proofs, ruled that bill would not sustain recovery based upon such theory irrespective of who was the inventor, and permitted amendments to correspond with the proofs, such action did not constitute an abuse of discretion (3 Comp. Laws 1929, § 14144; Court Rule No. 25 [1933]).

Trustee's liability for profits made by him through breach of trust, see 1 Restatement, Trusts, § 205.

6. PATENTS—INTERFERENCE—FRAUD—TRUST EX MALEFICIO.

In corporation's suit for accounting by some of its high-salaried executive officers and to hold them as trustees *ex maleficio* of certain patents and royalties therefrom, Supreme Court's *de novo* consideration of record does not support finding of trial court that patentee was the first inventor of the cushion spring construction patented rather than plaintiff's employee but requires finding that defendant executives procured issuance of patent to patentee through breach of trust of such executives by means of wrongful instructions to plaintiff's attorney to withdraw interference claims while plaintiff's application covering same construction was pending and then shared ownership rights and royalties in patent issued and entitled plaintiff to such patent and royalties therefrom less necessary expenses incurred in obtaining the patent.

7. CORPORATIONS—EXECUTIVE EMPLOYEES—TRUSTS EX MALEFICIO—PATENTS.

In suit by plaintiff corporation against some of its high-salaried executives, another corporation and one of its trusted employees and the assignee of certain patents for an accounting and to hold the individual defendants as trustees *ex maleficio* of the patents and royalties paid for use thereof where evidence fails to support claim that seat back spring patent was wrongfully appropriated by the individual defendants by using the patentee as the pretended inventor, but it is claimed that defendant executives and employees in breach of trust conspired with the patentee and acquired interests in patent usable in the business conducted by both corporations, determination must be made as to what duties the executives and employee owed to their respective employers.

8. SAME—PATENTS—BREACH OF TRUST RELATIONSHIP.

Well-paid officers and executive employees of spring and wire company who discovered a patented spring construction prior to issuance of patent, who not only failed to disclose same to employer but obtained a personal financial interest therein, directed employer's attorney to withdraw interfering claims on company-owned application for practically identical construction and by subterfuge concealed their interests in such patent as well as a second spring patent used by plaintiff thereby voluntarily placed themselves in the position of serving two conflicting interests and entitled the employer to profits made and advantages gained by such defendants.

9. Principal and Agent—Profits—Performance—Violation of Duty.

A person who undertakes to act for another shall not, in the same matter, act for himself, and all profits made and advantage gained by the agent in the execution of the agency belong to the principal whether or not the profit or advantage be the result of the performance or of the violation of the duty of the agent if it be the fruit of the agency.

10. Corporations—Directors—Fiduciaries.

Directors of a corporation occupy a fiduciary relation toward the corporation and its stockholders and are treated by courts of equity as trustees.

11. Same—Nature of Duties of Directors.

Directors of a corporation are held to the utmost good faith in their dealings with the corporation and must manage its affairs solely in its interest, hence they may not acquire property for themselves which it is their duty to acquire for the corporation and which is necessary for its purposes.

12. Same—Directors and Executive Employees—Duties.

Directors and executive employees of a corporation owe a strict and full measure of duty to their principal.

13. Same—Trusted Employees and Officers—Refusal of Patentee to Deal with Employer.

Fact that party in whose name a patent, usable by plaintiff corporation, was issued for a spring construction and who had once worked for plaintiff for about two months would not deal with it would not give its executive employee who also did experimental work and other trusted employees and officers the right to go outside of their employment and to acquire a financial interest in such patent for their personal profit.

14. Action—Probate Code—Estates of Decedents.

Provision of probate code barring all except certain actions against executors and administrators would not apply to suit for accounting against an estate which was closed and order assigning residue entered before the code became effective (Act No. 288, chap. 8, § 22, Pub. Acts 1939).

15. Equity—Estates of Decedents—Jurisdiction—Fiduciaries.

The circuit court in chancery had jurisdiction of suit against estate of deceased defendant where suit was commenced prior to effective date of probate code, and involved determination

as to the fiduciary relationship between deceased and his employer; the remedy in the probate court being inadequate (3 Comp. Laws 1929, § 15519; Act No. 288, Pub. Acts 1939).

16. EXECUTORS AND ADMINISTRATORS—CONSPIRACY—PATENTS.

In suit against administratrix of estate of man who with others had conspired to obtain patents on an article manufactured by plaintiff, claim of administratrix that deceased was a *bona fide* purchaser of an interest in the patent was without merit under circumstances disclosed.

17. CORPORATIONS—OFFICERS—TRUSTEE EX MALEFICIO—PATENTS—UNJUST ENRICHMENT.

The fact that corporations, seeking an accounting by some of their executive officers and employees and to establish such individuals as trustees *ex maleficio* of certain patents and royalties paid by the corporations, may not have sustained a loss because such item of cost was passed on to purchasers of goods embodying the patented construction would not preclude recovery by such corporations from such defendants who through conspiracy, breaches of duty, and wrongdoings have unjustly enriched themselves.

18. SAME—DIRECTORS—OFFICERS—BREACH OF FIDUCIARY RELATION—DAMAGES.

Directors and officers of a corporation occupy a fiduciary relationship toward the stockholders and such profit as they may gain as a result of the breach of duties involved in such relation belongs to the corporation irrespective of whether or not their dealings have damaged the corporation.

19. TRUSTS—PARTICIPATION OF THIRD PARTY IN VIOLATION BY FIDUCIARY.

A third person who participates in the violation of duty by one who occupies a fiduciary relation to another is liable to the beneficiary.

20. SAME—BREACH OF TRUST—JOINT AND SEVERAL LIABILITY OF PARTICIPANTS FOR PROFITS.

One who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise.

21. SAME—PARTICIPATION IN BREACH OF TRUST.

Defendant who assisted his aunt in the collection and distribution of royalties received for use of certain patents but who was not a party to the conspiracy by which such patents were

obtained by other defendants nor recipient of any part of· the royalties was not liable to account to corporations for whom other individual defendants are declared to hold patents as trustees *ex maleficio*.

22. PATENTS—TRUST EX MALEFICIO—ROYALTIES—EXCLUSIVE LICENSE—SUBLICENSEE.

In suit for accounting as to royalties from such individual defendants as are found to have been trustees *ex maleficio,* exclusive licensee for use of such patent is entitled to entire royalties collected less amount it had received from sublicensee.

23. SAME—TRANSFER OF PATENT—ACCOUNTING AS TO ROYALTIES.

In suit for transfer of patents and accounting as to royalties from such individual defendants as are found to have been trustees *ex maleficio* where one patent is ordered transferred to plaintiff corporation, such corporation is held entitled to such royalties as defendants have received less cost of procuring issuance of the patent and amount exclusive licensee was entitled to under circumstances involved.

24. INTEREST—BREACH OF DUTY—DISCRETION OF COURT.

In a chancery suit to recover for alleged breach of duty and wrongdoing of certain individual defendants, the allowance of interest is discretionary.

25. SAME—AFFIRMATIVE RELIEF IN SUPREME COURT—ENTRY OF DECREE—PAYMENT.

In suit wherein corporations sought the transfer to themselves of patents usable by them in the manufacture of their products and for an accounting by some of their trusted officers and employees, wherein Supreme Court grants affirmative relief denied by trial court, interest is allowed from entry of decree in Supreme Court until moneys are paid to corporations.

Appeal from Wayne; Miller (Guy A.), J. Submitted June 16, 1943. (Docket No. 53, Calendar No. 42,174.) Decided October 11, 1943. Rehearing denied November 30, 1943.

Bill by L. A. Young Spring & Wire Corporation against William A. Falls, Desire H. Van Hove, Thomas Mahoney, Newton E. Shockey, Mabel C. Ruppert, as administratrix of the estate of Albert A. Ruppert, deceased, Elizabeth Burch, assignee from and successor trustee to Fred Burch, deceased,

Austin G. Van Hove, and General Motors Corporation for an injunction restraining payment of money by defendant corporation to Elizabeth Burch and the transfer of patents, to cancel a contract and to have the individual defendants declared trustees *ex maleficio*. Cross bill by General Motors Corporation against plaintiff and the other defendants for an accounting, to have patents declared to be the property of plaintiff, and that cross plaintiff have the right to free use of patents, and to cancel an agreement. Bill dismissed. Decree for cross plaintiff against all defendants except Elizabeth Burch and Austin G. Van Hove. Plaintiff appeals. Cross plaintiff cross-appeals. Vacated except as to defendant Austin G. Van Hove and decree ordered entered in Supreme Court.

*Cook, Smith, Jacobs & Beake,* for plaintiff.

*Henry M. Hogan (Jacob A. Tolonen,* of counsel), · for cross plaintiff.

*John P. O'Hara* and *Austin G. Van Hove,* for defendants Falls, Van Hove, Mahoney and Shockey.

*Jay F. McMullen* and *Nelson S. Shapero,* for defendant Ruppert.

Starr, J. Our former decision in this case (*L. A. Young Spring & Wire Corp.* v. *Falls,* 293 Mich. 602) should be reviewed prefatory to this opinion. In October, 1938, plaintiff filed bill of complaint against the above-named defendants for an accounting and to hold all defendants, except General Motors Corporation, as trustees *ex maleficio* of certain patents and the royalty proceeds therefrom. On motion the trial court dismissed plaintiff's bill and also General Motors' cross bill on the ground

that as the suit involved the issuance and ownership of patents, the State court did not have jurisdiction. On appeal we determined that as plaintiff's bill "only incidentally asserts a right under the patent law," the State court had jurisdiction. The order of dismissal was reversed and the case remanded for further proceedings.

Following the trial, which extended over a period of two months or more, the trial court entered decree dismissing plaintiff's bill and amended bills against all defendants and dismissing General Motors' cross bills against defendants Elizabeth Burch and Austin G. Van Hove. The decree determined that cross plaintiff General Motors should recover the sum of $92,808 from defendants Mahoney, Falls, Shockey, Desire H. Van Hove, and Mabel C. Ruppert, administratrix, or any of them. Such award to General Motors represented the difference between patent royalties of $181,210.28 which it had paid to one Fred Burch and defendant Elizabeth Burch, as trustees for themselves and other individual defendants, and sublicense royalties of $88,402.28 which it had collected from plaintiff and other sublicensees of the patents involved. The decree did not provide for interest on the award to General Motors. Plaintiff appeals, and all defendants except Elizabeth Burch and Austin G. Van Hove cross-appeal from such decree. This being a chancery case, we consider the same *de novo:*

Plaintiff and its predecessor companies, with main offices and factory in Detroit and branch factories in Oakland, California, and other cities, have been engaged in the manufacture of automobile cushion springs and other spring and wire products for more than 25 years. Defendant General Motors Corporation is engaged in the manufacture of automobiles, the bodies for which are

manufactured by its so-called Fisher Body division. During the occurrence of the principal transactions involved in this suit, defendants Mahoney, Falls, Shockey, and Desire H. Van Hove, herein referred to as "defendant executives," all held high-salaried executive positions of trust and confidence with plaintiff corporation. Defendant Mahoney was a director, vice-president, and general manager for 10 years or more prior to his resignation in August, 1932. His nephew, defendant Falls, was a director and assistant manager and for about three years prior to his resignation in 1935 was vice-president and general manager. Defendant Shockey was factory manager of plaintiff's Detroit plant, and for several years prior to his leaving in 1935 he was also assistant general manager. Defendant Desire H. Van Hove was employed in plaintiff's sales department from 1923 until about October, 1934, and supervised the construction of samples and did experimental and development work. Much of this was in connection with plaintiff's business with General Motors, and he was in close contact with Albert A. Ruppert, its trim engineer. Other than its president, L. A. Young, the four defendant executives were the principal officers and executives of plaintiff corporation. During the time of the transactions in question they individually received salaries and bonuses from plaintiff ranging from about $10,000 to about $38,000 a year.

Fred Burch, who the individual defendants claim invented and patented the spring constructions for cushion seats and backs involved in the present case, was a brother-in-law of defendant Desire H. Van Hove, and he acted as trustee for the interests of himself, said Albert A. Ruppert, and the defendant executives in such patents and the royalties therefrom. Burch died in January, 1935, and he was suc-

ceeded by his wife, defendant Elizabeth Burch, as assignee and successor trustee, in connection with such patents and royalties. After Burch died, his nephew, defendant Austin G. Van Hove, the son of defendant Desire H. Van Hove, assisted said Elizabeth Burch, trustee, in connection with the distribution and payment of the royalty proceeds from the Burch patents. All cushion springs and upholstery purchased by the Fisher Body division of General Motors were subject to the approval of Ruppert, its trim engineer. A vice-president of General Motors testified that "during the time Mr. Ruppert was employed as trim engineer, the Fisher Body Company never adopted any cushion springs without his approval." Ruppert died in May, 1938, and his administratrix, Mabel C. Ruppert, was made a party defendant in the present case. For brevity we refer to defendants Elizabeth Burch, Mabel C. Ruppert, administratrix, Austin G. Van Hove, and the four defendant executives as the "individual defendants."

It is unnecessary to reiterate in detail the allegations of plaintiff's bill and amendments and of defendant General Motors' cross bill and amendments, as the same are set forth in our former decision in this case. Suffice it to say in summary that plaintiff charged that defendant executives, in breach of their duties as trusted officers and employees, "fraudulently, maliciously and intentionally conspired" among themselves and with said Fred Burch and Albert A. Ruppert to deprive it of certain inventions in spring constructions for seat and back cushions and to convert and misappropriate such inventions to their own benefit by using said Burch as the pretended inventor; that Burch obtained patents for such inventions and granted manufacturing licenses thereunder to defendant

General Motors; and that Burch and defendant Elizabeth Burch as trustees collected royalties of approximately $181,000 from General Motors and divided such royalties between the defendant executives, Ruppert and his estate, and Burch and defendant Elizabeth Burch. Plaintiff also alleged, in general, that it was the duty of defendant executives as trusted officers and employees to disclose and make known to plaintiff all designs, improvements, and inventions pertaining to its spring manufacturing business and not to appropriate and convert any such designs, improvements or inventions to their own use and benefit. Plaintiff prayed that it be decreed to be the owner of the Burch patents and royalty proceeds therefrom; that the individual defendants be decreed to be trustees *ex maleficio* of the Burch patents and royalties for the use and benefit of plaintiff; and that the individual defendants and General Motors account for all royalties in connection with such patents and license and sublicense agreements.

Defendant executives answered, admitting the alleged agreement with Fred Burch and that they each received a share of the royalties paid by General Motors to Burch and his wife as trustees. They denied the charge of fraud and conspiracy and that plaintiff had any interest in the Burch patents and royalties. Defendants Elizabeth Burch and Mabel C. Ruppert, administratrix, answered, admitting the payment of royalties by General Motors and the division thereof, but denying plaintiff's right to the relief sought. General Motors answered, admitting the royalty agreements with Burch, the payment of royalties to Burch and wife as trustees, the granting of sublicenses under the Burch patents, and the collection of sublicense royalties in the amount of about $88,000, of which about $54,000

were collected from plaintiff. General Motors also admitted the alleged fraud and conspiracy between its trim engineer Ruppert, the defendant executives, and Burch, and in its cross bill alleged that by reason of such fraud and conspiracy the individual defendants became trustees *ex maleficio* for its benefit as to all royalties it had paid to Burch and wife as trustees. It denied plaintiff's right to recover; and prayed that its royalty license agreements with Burch be canceled and for an accounting by plaintiff and by the individual defendants.

The record is voluminous, but we shall discuss only that testimony material to the issues involved. George Stackhouse, a designer and inventor employed in plaintiff's Oakland, California, plant, testified that during or prior to 1927 he conceived the idea of an improvement in spring construction, which was usable in the manufacture of mattresses and automobile cushions; that in the spring of 1927 he explained and demonstrated such idea to plaintiff's general manager, defendant Mahoney; that about July, 1928, he made a sample model of such spring construction, and his testimony in that regard is corroborated by the manager of the Oakland plant and the superintendent of the trimming department of the Fageol Motors Company. Stackhouse testified that such sample model later disappeared from his experimental room, which he occupied with defendant Falls' brother, Edwin Falls. There was also testimony that in the fall of 1928 plaintiff's Oakland plant made sample cushions, using such spring construction, for one of its customers. In March, 1929, Stackhouse sent a sample of such spring construction to plaintiff's patent attorney in Kalamazoo, Michigan, and on July 5, 1929, his application for a patent thereon was filed. It is undisputed that a patent issued on

the Stackhouse application would be the property of plaintiff as his employer.

Defendant Desire H. Van Hove testified that about January 1, 1928, his brother-in-law, said Fred Burch, who had worked for plaintiff about two months in 1922, showed him a sample spring construction for automobile seat cushions. Van Hove said that "the date of conception of this spring, so far as Mr. Burch was concerned was between Christmas of 1927 and New Year's of 1928," but that he had no records of any kind. Van Hove said that he helped Burch complete such spring construction and that he showed it to defendants Falls and Shockey in February, 1929, and a few days later called it to the attention of Ruppert, trim engineer for General Motors; that samples of such Burch spring construction were made up for Ruppert in plaintiff's sample department; and that he assisted Burch in connection with his application, filed about April 10, 1929, for a patent on such construction. Van Hove further testified that the Burch spring construction *"was right down the line of the manufacturing interests of the L. A. Young Spring & Wire Corporation* (plaintiff)." The testimony establishes that in 1929 or the early part of 1930 defendant executives, Burch, and Ruppert had an oral agreement that they would share in the royalties from the Burch patent and that such oral agreement was later embodied in writing.

There is some conflict and confusion in the testimony as to just what features of spring construction the Stackhouse application and the Burch application covered. It would serve no purpose to describe in technical terms the claims made in such patent applications. The testimony of two patent attorneys each with long experience in that field, together with other testimony, is convincing that

the Stackhouse and Burch applications covered substantially the same spring construction. Patent attorney Earl testified in part:

"In regard to the difference in the claims presented under the Burch application and those presented in the Stackhouse · application, no two patent attorneys use the same language in defining a structure. When a structure is completed in accordance with the drawings of the Stackhouse application and another structure is completed in accordance with the drawings in the Burch application, *there would be no practical difference between the structures.*"

Patent attorney Barnes testified in part:

"Patent-wise the mattress spring construction and the cushion spring construction for automobiles are considered practically the same.   *   *   *
"*There isn't a thing that distinguishes the Burch construction from the Stackhouse construction. They are two interfering inventions.*
"The gist of the first Burch application and the Stackhouse application was the idea of using those burlap partitions for putting the springs under initial compression, together with the coil spring connectors in the pocket in the top of the burlap partition."

On November 21, 1930, in consideration of $2,500, Burch granted General Motors an option for an exclusive license under his patent when issued, and their agreement provided that if General Motors exercised the option, it would pay Burch certain specified royalties. The $2,500 paid to Burch for such option was divided between the defendant executives, Burch, and Ruppert on the basis of 10 per cent. to Burch and 18 per cent. to each of the other five.

In December, 1930, Mr. Earl, plaintiff's patent attorney, was advised by the United States patent office of interference between the claims in the applications of Stackhouse and Burch. The matter of such interference was called to the attention of defendant Falls, who discussed it with defendants Mahoney and Desire H. Van Hove. In pursuance of such discussion Van Hove went to Kalamazoo on December 30th and interviewed attorney Earl. As to such interview, Van Hove testified in part:

"I probably told him I was there to ask him to explain the Stackhouse application, * * * and that I would like to compare its construction with that we were making in the shop for the Fisher Body (the Burch construction). He described the whole thing to me, showed me the patent drawings and we discussed it. * * *

"Q. * * * Had you seen the construction like that before?

"A. There was a similarity there with the Burch construction. * * *

"I didn't tell Mr. Earl it had been something that my brother-in-law (Burch) had gotten up and shown to me. * * * I didn't tell him anything about my connections with it, nor that it (the Stackhouse structure) was the same (as the Burch) structure that I had shown to Falls, Mahoney and Shockey.

"Q. Did you tell Mr. Earl that you had an 18 per cent. interest in that (Burch) patent?

"A. I didn't think it was necessary.* * *

"Q. And you did tell him that your attention was first called to it through the Fisher people?

"A. I didn't tell him that, no.

"Q. You didn't tell him that? You lied to him, didn't you?

"A. I suppose I did. * * *

"Q. As a matter of fact, you were the one that had called it to the attention of the Fisher Body yourself?

"*A.*   Yes, sir.

"*Q.*   Now, you told Mr. Earl that this construction was first brought to your attention by the Fisher Body people the *early* part of 1930?   *   *   *

"*A.*   Yes, sir.   *   *   *

"*Q.*   You knew that on November 21, 1930, that General Motors had paid the $2,500 (for the Burch option)?

"*A.*   Yes, sir.

"*Q.*   And that you had your 18 per cent. share of it.   You knew that when you were talking to Mr. Earl?

"*A.*   Yes, sir.   *   *   *

"*Q.*   Now, after you men had gotten through with your conference of December 31, 1930, did you agree that the thing to do was to have Mr. Earl withdraw all of the claims in the Stackhouse patent which in any way would interfere with the claims in the Burch patent?   *   *   *   Didn't you think that was the best thing to do at that time?

"*A.*   Well, I presume to say I did.   *   *   *

"*Q.*   Weren't you a little more anxious to get the 18 per cent. out of it than you were to have the L. A. Young Spring & Wire Company have the patent with no royalty to yourself?

"*A.*   I suppose so, yes."

While Van Hove was in his office on December 30th, attorney Earl wrote to plaintiff, "attention Mr. Mahoney and Mr. Falls," in part as follows:

"Mr. Van Hove is at my office and we have been discussing the Fisher Body construction in which the helical cross tie members are inclosed in pockets or hemmed into the edges of the listing.

"Mr. Van Hove's recollection is that this construction was first brought to his attention by the Fisher Body people the early part of 1930.   The Stackhouse structure of this type was first brought to our attention March 29, 1929, that is, we received

a model on that date, and we received a letter from Mr. Platt (manager of plaintiff's Oakland plant) describing the structure dated April 2, 1929. The Stackhouse application was filed in the patent office under date of July 5, 1929.

"The favorable point of this is that the matter was in our hands long prior to the time that this type of structure was brought to the attention of Mr. Van Hove by the Fisher Body people, so they cannot accuse him of being in any wise responsible for the Stackhouse application."

Regarding his interest in the Burch patent and his correspondence with attorney Earl, defendant Falls testified in part:

"On *April 20, 1929,* I knew all about the Burch construction and knew that we men  *  *  *  were each to have an interest in it.  *  *  *

"I think I advised Mr. Earl to drop the interference.  *  *  *  I know I advised him to do it.  *  *  *  Because in my estimation the Burch application was first and it was also superior to the Stackhouse application.

"*Q.* You also had an interest of 10 (18) per cent. in the Burch?

"*A. That was it in part.*  *  *  *

"*Q.*  *  *  *  You didn't tell Mr. Earl the truth about your knowledge of where the Burch structure had originated, did you?

"*A.* No, I didn't."

In replying to Falls' letter of December 31st, attorney Earl stated:

"Your letter of December 31st relative to the Stackhouse application  *  *  *  is at hand.

"Although you do not definitely· instruct the cancellation of the claims in this case, the retention of which might result in a declaration of interference with the application owned by Fisher Body, I have prepared an amendment, copy of which I am

inclosing, canceling claims 12, 13, 15, 16, 17 and 18.

"Claims 12, 13, 15 and 16 are claims originally presented in the Stackhouse application, and claims 17 and 18 are the claims suggested by the examiner for purposes of interference. *The four original claims canceled are of such scope that they would most certainly be involved in the interference.* * * *

"I have hesitated about sending in the amendment without your specific directions *as I do not want Mr. Stackhouse or Mr. Platt to think I have taken it upon myself to do this.* Therefore, if you will wire our office your approval on receipt of this we will forward the amendment."

Defendant Falls further testified:

"I remember, that Mr. Earl called my attention to the fact that if I had withdrawn the claims that might come in interference from, the Stackhouse patents, as against the claims of the Burch patents, that it would take the heart out of the Stackhouse patents. * * * *Knowing that I was taking the heart out of the Stackhouse patent,* I sat down and wrote * * * a telegram that I caused to be sent * * * to Mr. Earl on January 5, 1931. * * *

" 'Chappell & Earl: Your letter third cancel all claims you think conflict with Fisher application. W. A. Falls.' "

Defendant Desire H. Van Hove also testified that he discussed the matter of the interference between the Stackhouse and Burch patent applications with Mr. Ruppert. In commenting upon the defendant executives' fraud and breach of duty in canceling the claims of the Stackhouse patent application which interfered with the Burch application, the trial court said:

"It was the duty of these defendants to protect the interest of the plaintiff company as the assignee

of the Stackhouse application by seeing to it that the interference conflict in the patent office was carried out in good faith, and with the view of protecting the plaintiff company's interest. Instead of so doing, the fact of the Stackhouse application was never made known to the managing officers of the plaintiff company. The interference contest was suppressed. *The rights of the plaintiff company were secretly abandoned in favor of the Burch patents in which these defendants were interested. This was a fraud upon the rights of the plaintiff corporation.* There can be no doubt or argument about that. * * *

"That company claims that the suppression of the interference contest was a fraud on its rights. This is undeniable."

As a result of the cancellation and withdrawal of the claims of the Stackhouse application which interfered with the Burch application, patent No. 1,793,421 (herein referred to as the "first Burch patent") was issued to Burch February 17, 1931. On March 9, 1931, General Motors exercised its option under the November 21, 1930, agreement with Burch to take an exclusive license under his patent and made its first payment of royalties to Burch on May 16, 1931. The previous oral agreement between the defendant executives, Burch, and Ruppert for sharing in the royalties from the Burch patent was embodied in a written agreement on April 20, 1931. On that date Burch assigned his patent to himself as trustee "for the benefit of said Fred Burch and another," and the agreement identified the defendant excutives and Burch and Ruppert as the beneficiaries of such trust. The agreement provided, in substance, that Burch would pay 10 per cent. of the expense in connection with obtaining his patent and receive 10 per cent. of the royalties therefrom, and that the four defendant executives and Ruppert

would each pay 18 per cent. of the expense and re-
ceive 18 per cent. of the royalties.

In the summer of 1931 defendant Desire H. Van
Hove assisted Burch in the preparation of drawings
relating to another spring structure for use in auto-
mobile seat backs. Although Van Hove, Burch, and
Ruppert were jointly participating in the royalties
from the first Burch patent, Van Hove assisted
Burch in preparing a letter dated August 12, 1931,
to the Fisher Body Corporation, attention Ruppert,
in which he stated in part:

"Perhaps you have forgotten who I am as it has
been a long time since I called on you.

"I am the party who has the patent on the cushion
you have been using for the past year.  *  *  *  I am
inclosing sketches of improvements which I wish to
suggest in connection with the cushion construction,
which I believe will make an improvement where it
is used for a back construction."

Burch filed application for patent for such seat
back spring construction, and patent No. 1,924,022
(herein referred to as the "second Burch patent")
was issued to him August 22, 1933. In its amended
bill plaintiff charged, in substance, that such seat
back spring construction had been invented by one
of its employees and that defendant executives had
appropriated the same by using Burch as the pre-
tended inventor. However, plaintiff offered no
direct proof in support of such charge, and its
counsel stated that the employee who, it claimed, had
invented such spring construction had died prior to
the trial.

On June 28, 1933, prior to the issuance of the
second patent, Burch entered into a supplemental
agreement with General Motors whereby such
patent, when issued, was to be included in the origi-
nal license agreement of November 21, 1930, relating

to the first patent. Such supplemental agreement provided, in substance, that both Burch patents were included under one royalty rate and further that "the minimum royalty clause in the original agreement shall stand as there written for both inventions." Burch assigned his above-mentioned second patent to himself "in trust for the benefit of said Fred Burch and another," and on September 7, 1933, Burch, Ruppert, and the defendant executives entered into a written agreement which provided that Burch held a 10 per cent. interest and Ruppert and the four defendant executives each an 18 per cent. interest in such patent and royalties therefrom. Therefore, the parties had the same respective interests in both the first and second Burch patents and royalties.

On January 3, 1935, prior to his death, Burch and his wife, defendant Elizabeth Burch, and the defendant executives and Ruppert executed an agreement whereby defendant Elizabeth Burch was thereafter to act as trustee of the two Burch patents and royalties therefrom. Subsequent to that date Elizabeth Burch collected the royalties from General Motors and divided and paid the same to the defendant executives, Ruppert and his estate, and to herself. After the death of Fred Burch January 19, 1935, defendant Austin G. Van Hove assisted his aunt, said Elizabeth Burch, in keeping the records of the trust and in making distribution of the royalty proceeds.

Subsequent to the time the defendant executives and Ruppert acquired an interest in the first Burch patent, defendant Falls as an officer of plaintiff corporation negotiated a sublicense agreement with General Motors whereby, in consideration of certain specified royalties, plaintiff was granted a nonexclusive sublicense to manufacture seat cushion

springs under such patent. Later another sub-license agreement was negotiated with General Motors whereby plaintiff was to pay certain specified royalties for a nonexclusive license to manufacture springs under both Burch patents. In pursuance of such agreements plaintiff paid to General Motors sublicense royalties under the Burch patents in the aggregate amount of $54,662.76. During the period from November 19, 1930, to July 28, 1938, General Motors paid to Burch and Elizabeth Burch as trustees royalties under the two Burch patents (including the option payment of $2,500) in the aggregate amount of $181,210.28. During such period General Motors collected sublicense royalties under such patents totaling $88,402.28, of which the above-mentioned sum of $54,662.76 was paid by plaintiff. As the second royalty agreement executed June 28, 1933, between General Motors and Burch combined the first and second Burch patents under single rates, it is quite impossible to divide and allocate the total royalties of $181,210.28 accurately as between the first and second Burch patents.

At the conclusion of all proofs the trial court ruled that, under the allegations of its bill of complaint, plaintiff could not assert a theory of recovery against the defendant executives based upon their alleged breach of duty as trusted officers and employees, irrespective of who was the inventor of the cushion spring constructions covered by the two Burch patents. On motion the court permitted amendments of both plaintiff's bill and General Motors' cross bill to "correspond with the proofs." Both plaintiff and cross plaintiff General Motors filed amended bills based upon such theory of recovery. The court said in part:

"I am going to treat the bill of complaint as though it does clearly set forth that theory. I think

the receipt of such an amendment is probably within the discretion of the trial judge. * * *

"I think that the situation would be well enough taken care of if the amendment was limited to make the bill of complaint correspond with the proofs. * * * I am disposed to leave the matter as it is on the record, namely, that the bill of complaint (and General Motors' cross bill) may be considered to stand amended insomuch as it is necessary to amend it, in order to set up the theory by virtue of their status as officers."

The individual defendants contend that the proposed amendments to include a theory of recovery based upon the alleged breach of duty by defendant executives in effect asserted a new cause of action which was barred by the two-year statute of limitations (3 Comp. Laws 1929, § 13983 [Stat. Ann. § 27.612]) which provides as follows:

"If any person who is liable to any of the actions mentioned in this chapter, shall fraudulently conceal the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within two years after the person who is entitled to bring the same shall discover that he had such cause of action, although such action would be otherwise barred by the provisions of this chapter."

While alleging the wrongful appropriation of patents, plaintiff and General Motors in their bill and cross bill also alleged the duties of defendant executives as trusted officers and employees; their breach of such duties; and their conspiracy with Ruppert and Burch in connection with the Burch patents. Substantially the same testimony would support both theories of recovery. The amendments to "correspond with the proofs" did not state a new

cause of action.  3 Comp. Laws 1929, § 14144 (Stat.
Ann. § 27.838), provides:

"The court in which any action or proceedings
shall be pending, shall have power to amend any pro-
cess, pleading or proceeding in such action or pro-
ceeding, either in form or substance, for the further-
ance of justice, on such terms as shall be just, at any
time before judgment or decree rendered therein.
The court at every stage of the action or proceed-
ings shall disregard any error or defect in the pro-
ceedings, which do (does) not affect the substantial
rights of the parties."

We have held that the above-quoted statute is
broad and is to be liberally construed.  *Johnson* v.
*Fremont Canning Co.,* 270 Mich. 524; *M. M. Gantz
Co.* v. *Alexander,* 258 Mich. 695.  Court Rule No. 25
(1933) provides that upon the application of either
party the court may permit the filing of an amended
or supplemental pleading.  We conclude that the
trial court did not abuse its discretion in granting
such amendments.

As hereinbefore explained, Fred Burch and plain-
tiff's employee Stackhouse both filed applications in
1929 for patents covering an improvement in spring
construction for seat cushions.  From our study of
the record, with particular reference to the testi-
mony of the patent attorneys, we are convinced there
was no practical difference between the spring
structures claimed in the Burch and Stackhouse ap-
plications.  They clearly covered interfering inven-
tions, and, therefore, we must determine who was the
first inventor.

Stackhouse testified, in substance, that for 20
years or more he had been engaged in the designing
and manufacturing of wire spring structures for up-
holstery, seats, and mattresses; that during his

employment by plaintiff and its predecessor companies, he had obtained and assigned to his employers 18 or more patents; that his work for plaintiff was "experimental work and the developing of new ideas." He further testified that in 1927 or prior thereto he conceived an idea for an improvement in spring construction; that in the spring of 1927 he explained and demonstrated his idea of such spring structure to defendant Mahoney; and that such idea or invention was later substantially embodied in his application for patent filed July 5, 1929. He said that in July, 1928, he made a spring structure embodying such idea, which fact was corroborated by two other witnesses; that later in 1928 he built two samples; and that plaintiff's Oakland plant made cushions embodying such structure for a motor coach company.

The only testimony as to when the spring structure covered by the first Burch application was invented, is that of his brother-in-law, defendant Desire H. Van Hove, who testified in part:

"Mr. Burch told me that he was fussing around and rebuilding a construction. He had an old car and he put those burlap sacks in there with some old tire cover springs that he had taken for a helical. I don't know when he had done that, but he showed it to me during the holidays of 1927 and 1928. He didn't tell me how long he had been working on it to get it up. * * * It was in February or the first few days of March of 1929, that I showed the same unchanged structure to Mr. Shockey, Mr. Falls and Mr. Ruppert. I bought a top rim and a bottom rim from an old Chevrolet construction, which were used in the construction that I had Mr. Burch make up for Mr. Ruppert. * * * I helped Mr. Burch in that construction, and when it was completed, I had Mr. Burch take it out to Mr. Ruppert. I went along with him."

Van Hove also testified that in making a sample structure, Burch ''had his wife (defendant Elizabeth Burch) sew the burlap up in the proper lengths.'' For some unexplained reason Elizabeth Burch was not called as a witness to corroborate his testimony regarding the date of the alleged Burch invention. Van Hove's uncorroborated testimony is not convincing in view of the fact that he admitted false representations to plaintiff's patent attorney regarding the Burch spring construction and, in substance, admitted that he was more interested in obtaining 18 per cent. of the royalties than he was in his employer's obtaining the patent. In commenting on the credibility of Van Hove's testimony, the trial court said:

''However, Mr. Van Hove testified on the stand to certain misrepresentations of fact which he made to Mr. Earl in Kalamazoo. This detracts materially from the value of the testimony. * * *
''Taking into consideration the character of the transactions of the defendants and the self-confessed deceitfulness of the conduct of Van Hove, great doubt is cast upon the testimony of Van Hove in this respect. * * * Van Hove's testimony * * * is a surprisingly pat refutation of the Stackhouse claim. It is not corroborated. True, Burch is dead, but Mrs. Burch is not and she could perhaps have remembered when her husband built his cushion, and when they all built Van Hove's. She was not a witness. As a matter of evidence, if the burden of proof were cast upon the defendants to show affirmatively that Burch conceived his invention in 1927, the answer ought to be that the evidence does not so show satisfactorily.''

With due regard to the finding of the trial court that Burch was the first inventor of the spring construction covered by the first Burch patent, never-

theless, we are satisfied that had we been sitting as a trial court, we should have reached a different conclusion. A careful study of the record, which we consider *de novo*, convinces us that Stackhouse was the first inventor of the cushion spring construction covered by the Stackhouse and Burch applications for patent and by the first Burch patent. Undoubtedly, a patent would have been issued on the Stackhouse application had not the defendant executives, as a part of their conspiracy, wrongdoing, and breach of trust, instructed plaintiff's patent attorney to cancel and withdraw the claims of the Stackhouse application which interfered with the claims of the Burch application. We are satisfied that the first Burch patent was obtained through the breach of trust and wrongdoing of the defendant executives. Accordingly, we hold that such patent rightfully belonged to and was the property of plaintiff corporation and that it is entitled to all royalties received therefrom by Fred Burch and defendant Elizabeth Burch as trustees, less the necessary expenses incurred in obtaining the patent. Later in this opinion in connection with our discussion of the second Burch patent, we shall consider and determine the rights of cross plaintiff General Motors in and to the royalties under both patents.

The second Burch patent covered a seat back spring construction, and, as hereinbefore mentioned, was included in the supplemental royalty license agreement between Burch and General Motors and was also included in the agreement of September 7, 1933, between Burch, the defendant executives, and Ruppert. We find no evidence sustaining plaintiff's charge that the invention covered by such second patent had been wrongfully appropriated by using Burch as the pretended inventor. However, both plaintiff and cross plaintiff General Motors contend

that, irrespective of who was the inventor of the
spring constructions covered by the two Burch
patents, the individual defendants became trustees
*ex maleficio* of all royalties collected from such
patents by Burch and his wife as trustees. They
base such contention upon the theory that the de-
fendant executives and Ruppert, in breach of their
duties as trusted officers and employees, conspired
with Burch and wrongfully acquired interests in the
Burch patents and royalties. Such contention
raises the question as to what obligations and duties
defendant executives and Ruppert owed their re-
spective employers.

Plaintiff was engaged in the manufacture of
springs for automobile seats and backs, and the
Burch patents covered spring constructions which
defendant Van Hove said were "right down the line
of the manufacturing interests" of plaintiff corpo-
ration and which defendant Mahoney said were
"right in the L. A. Young Company's line." The
testimony indicates that such spring constructions
were improved products which the spring manu-
facturers were looking for and wanted. The fact
that General Motors paid more than $181,000 for ex-
clusive licenses to manufacture under such patents
and that plaintiff and others paid General Motors
more than $88,000 for sublicenses, is ample proof
that the spring constructions covered by such
patents were of great value to plaintiff and to Gen-
eral Motors and others in the spring industry. De-
fendant Mahoney testified regarding his duty to
plaintiff and his interest in the Burch inventions in
part as follows:

"*Q.* * * * If there were a new construction,
you would try to get it and save it for the (plaintiff)
company; isn't that so?
"*A.* Certainly. * * *

"It was up to me to do everything I could to protect the company's interest, whether that was a matter of patents  *  * . *  or a matter of the relations between the company and its customers.  *  *' *

"I was not interested in any spring and wire article *that was in competition* with the (Young) Spring & Wire Company, *excluding the Burch matter.*  * * *

"If anything new came into the spring industry in the way of a new construction, I would certainly be interested in it.  * * *  We wanted to keep ahead of the game. If our competitor obtained a new construction, we tried to get a better one or at least one equally as good.  * * * .

"The spring industry was looking for something that could approach the quality of that de luxe spring but which could be manufactured at a cheaper cost. Putting my whole time into the Young company, I wanted to get such a spring for the company at a lower cost, if it was any good, to keep the company abreast of its competitors. I knew as a matter of fact that that was what I should do. * * *

"*Q.* Now, this so-called Fisher type or Burch type as you have been calling it was an article such as you would manufacture in the plant of the L. A. Young Spring & Wire Corporation? Isn't that true?

"*A.* Yes, sir.  * * *

"*Q.* They (plaintiff) paid out  * * *  (to General Motors) $54,000 for something that you had an interest in. Isn't that true?

"*A.* Yes, sir.  * *

"*Q.* And you were taking your 18 per cent. out of that $54,000 that was paid over by your employer?

"*A.* Yes, sir.  * * .

"*I always heard the Stackhouse construction and the Burch construction were identical.*"

Defendant Falls testified regarding his duty to plaintiff as his employer in part as follows:

"Anything new that I learned about in any way that I could get for the company, to  * * *  keep

it ahead of its competitors, I tried to get.   *   *   *
I assigned all patents to the Young company which
I obtained while I was in its employ.''

Defendant Shockey testified in part as follows:

''I hadn't gone before the board of directors of
the Young company and told them that I had an in-
terest (in the Burch patents), nor had I told Mr.
Young.   *   *   *
''I didn't think it was any of their business.
*   *   *
''I thought the (Burch) construction shown to me
by Mr. D. H. Van Hove was pretty good.   *   *   *
I had been manufacturing seats exclusively for many
years there in the L. A. Young plant No. 1 and
*knew when the Burch construction came to me that
it was something that could be manufactured in the
L. A. Young plants.*   *   *   *
''After talking to Mr. Ruppert, Mr. Falls, Mr. D.
H. Van Hove and myself had a talk some place in
the plant of the L. A. Young Spring & Wire Cor-
poration.   *   *   *   *The three of us decided that we
would get the construction from Mr. Burch, if we
could.*   *   *   *
''I think we all tried in a general way to keep
abreast of the patent situation so far as the spring
industry was concerned.   *   *   *   That was part of
my business.   *   *   *   Any time any new invention
came out or came to my notice I was interested right
away.   *   *   *   I was interested from the standpoint
of learning about it so as to help me in my work in
the plant.''

Defendant Desire H. Van Hove testified:

''I knew that that particular spring construction
(Burch) was *right down the line of the manufactur-
ing interests of the L. A. Young Spring & Wire Cor-
poration.*''

The above-quoted and other testimony is convinc-
ing that the defendant executives knew of the value

of the Burch spring inventions and recognized that it was their duty to disclose to plaintiff the information they obtained. However, they did not disclose any information regarding such inventions or the patent applications or their interest therein to plaintiff and by subterfuge and misrepresentations concealed their interest in such inventions. To hide their connection with the first Burch patent, they repeatedly referred to it as the "Fisher application." Ruppert also failed to disclose his interest in the Burch patents and royalties to his employer General Motors, although, apparently upon his recommendation, it entered into license agreements with Burch and paid more than $181,000 in royalties. Other than its president, Mr. Young, the defendant executives were the principal officers and executives in charge of the management of plaintiff corporation. They were well paid for their services, and they owed a full measure of loyalty and duty to plaintiff. The Burch inventions covered improved spring constructions which were in the line of plaintiff's spring manufacturing business. Commonly-recognized principles of honesty, loyalty, and integrity required the defendant executives to disclose their information regarding the Burch inventions to their employer. They put their interest in the Burch patents and royalties ahead of their integrity and of their duty to plaintiff. They voluntarily placed themselves in the position of serving two conflicting interests, that of their employer and their personal interests in the profits from the Burch inventions. Such conflict and their breach of duty were well evidenced by their causing the cancellation of the conflicting claims in the Stackhouse application so that a patent would be issued on the Burch application. It is quite apparent that they were more interested in obtaining their 18 per cent. of the

royalties from the Burch patents than they were in the business and welfare of their employer. In considering a somewhat similar situation in *Battle Creek Food Co.* v. *Kirkland,* 298 Mich. 515, Mr. Justice BUTZEL stated the rule as to the duties of trusted executive employees to their employer, pp. 519, 520:

"They were to a very large degree in complete charge of plaintiff. They owed it their full time, effort and faithful devotion. They occupied positions of trust.  *  *  *

"They remained full-time employees of plaintiff and, as such, it was their duty to do whatever was for the best interest of plaintiff."

In the case of *Pratt* v. *Shell Petroleum Corp.* (C. C. A.), 100 Fed. (2d) 833, in imposing a trust upon the royalty interests and leases acquired by defendant, a geologist employed by plaintiff corporation, the court said, p. 836:

"It must be held upon plain principles of reason and sound public policy that an agent occupying a place of trust and confidence is not permitted to put himself in a position in which his personal interests may come in conflict with his duty to his principal. He cannot assume a position which may afford the temptation to subordinate the interests of his principal to those of himself in the discharge of his duty."

In *American Circular Loom Co.* v. *Wilson,* 198 Mass. 182 (84 N. E. 133, 126 Am. St. Rep. 409), in determining the duty which defendant as a director and superintendent owed to plaintiff as his employer, the court stated, p. 206:

"He (defendant) occupied a confidential position.  *  *  *  The duties of his employment gave him the best means of acquiring knowledge in respect to the

plaintiff's machines and of any improvements that might be devised therein. Both as director and as hired servant in a position of trust and confidence, he owed to the plaintiff * * * 'the duty to be vigilant in acquiring information as to all experiments made in the plaintiff's factory relating to machinery, and to communicate to the board of directors or at least to the managing director all material information he might obtain in regard to contemplated improvements, in order to enable his employer to act intelligently and promptly upon the subject of acquiring title to any new inventions or patents relating to its machinery.' He was legally bound not to act in antagonism to the interests of the plaintiff."

In the case of *Michigan Crown Fender Co.* v. *Welch,* 211 Mich. 148 (13 A. L. R. 896), in determining the duty which defendant, an engineer, owed to plaintiff, as his employer, we said, pp. 159, 160:

"It was his duty to communicate to his principal facts relating to the business which ought in good faith to be made known to the latter. This subject is quite fully covered in the annotations to *Leathers* v. *Canfield,* 117 Mich. 277 (45 L. R. A. 33), and further authorities need not be cited. The corollary to that fundamental rule is thus concisely stated in 1 Mechem on Agency (2d Ed.), § 1224:

" 'The well-settled and salutary principle that a person who undertakes to act for another shall not, in the same matter, act for himself, results also in the other rule, that *all profits made and advantage gained by the agent in the execution of the agency belong to the principal.* And it matters not whether such profit or advantage be the result of the performance or of the violation of the duty of the agent if it be the fruit of the agency.'

"Where the agent is also an officer of a corporation for which he is acting there is added reason for rigidly adhering to the rule."

The duties and obligations of defendant executives as officers and directors and as trusted employees were substantially the same. In 2 Thompson on Corporations (3d Ed.), pp. 778, 855, §§ 1320, 1351, it is stated:

"The rule is thoroughly embedded in the general jurisprudence of both America and England that the status of directors is such that they occupy a fiduciary relation toward the corporation and its stockholders, and are treated by courts of equity as trustees. They are regarded as agents entrusted with the management of the corporation, for the benefit of the stockholders collectively, and as occupying a fiduciary relation in the sense that the relation is one of trust; and are held to the utmost good faith in their dealings with the corporation. They must manage the affairs of the corporation solely in the interest of the corporation. * * *

"Well-settled rules forbid them acquiring for themselves the property which it is their duty to acquire for the corporation and which is necessary for its purposes."

Directors and executive employees of a corporation owe a strict and full measure of duty to their principal. In *McKey* v. *Swenson*, 232 Mich. 505, 516, we said:

"The fiduciary relation of directors to a corporation, the rule of common honesty, the measure of fidelity exacted and the mastery of right over sordid motives and betrayals of trust have been so uniformly expounded by the courts that it would be but calling a roll of courts to cite the authorities."

See, also, *American Circular Loom Co.* v. *Wilson, supra; Farwell* v. *Pyle-National Electric Headlight Co.*, 289 Ill. 157 (124 N. E. 449, 10 A. L. R. 363); *Whitten* v. *Wright*, 206 Minn. 423 (289 N. W. 509); *Nebraska Power Co.* v. *Koenig*, 93 Neb. 68 (139 N. W. 839); *Pratt* v. *Shell Petroleum Corp., supra; Irv-*

*ing Trust Co.* v. *Deutsch* (C. C. A.), 73 Fed. (2d) 121; 13 Am. Jur. p. 959, § 1007.

It was the duty of defendant executives to disclose their information regarding the two Burch spring inventions to plaintiff. It was their duty to use their best efforts to obtain for plaintiff a patent based upon the Stackhouse application. It was also their duty not to conspire with Ruppert and Burch and not secretly to acquire personal interests in the Burch inventions and royalties. They breached their trust and their duties to their employer, and they should not be permitted to retain the profits of their wrongdoing.

Defendant Desire H. Van Hove testified that Fred Burch had refused to deal with plaintiff corporation, and defendant executives argue that such refusal gave them the right to go outside their employment and acquire interests in the Burch inventions. Van Hove's testimony in that regard was not corroborated. Such argument is without merit, as it would open the door for any trusted executive to justify his breach of duty in acquiring · interests adverse to those of his employer by merely claiming that his employer could not obtain such interests. If defendant executives believed, as claimed, that to disclose their information to plaintiff would have breached the confidence of Burch, then it was at least their duty not to acquire interests in the Burch inventions for their personal profit. *Fine* v. *Lawless,* 139 Tenn. 160 (201 S. W. 160, L. R. A. 1918 C, 1045); *Irving Trust Co.* v. *Deutsch, supra;* Restatement of the Law of Restitution, pp. 802-804, § 195 b, c, d.

Defendant Mabel C. Ruppert, administratrix, contends that the claims of plaintiff and cross plaintiff General Motors against the Ruppert estate and herself as administratrix are barred because such claims were not presented against the estate in the

probate court proceedings. Ruppert died in May, 1938, and she was appointed administratrix. Both Ruppert and his estate received and participated in the royalties in question. The present suit was begun in October, 1938, and on February 4, 1939, she filed answer. The Ruppert estate was closed and an order assigning residue entered July 13, 1939. Act No. 288, chap. 8, § 22, Pub. Acts 1939 (probate code) (Comp. Laws Supp. 1940, § 16289-8 [22], Stat. Ann. 1942 Cum. Supp. § 27.3178 [432]), cited by counsel, did not become effective until September 29, 1939, and, therefore, has no application to the present case. The prior statute (3 Comp. Laws 1929, § 15688 [Stat. Ann. § 27.2835]), which provided for the appointment of commissioners on claims and forbade certain actions against an administrator or executor, was considered in *Lane* v. *Wood,* 259 Mich. 266. In that case we said, pp. 271, 272:

"The Constitution (1908), art. 7, § 13, vests in the probate court such jurisdiction and powers as may be prescribed by the legislature. The legislature, in declaring the powers and jurisdiction of the probate court, added the following proviso:

" 'That the jurisdiction conferred by this section shall not be construed to deprive the circuit court in chancery in the proper county of concurrent jurisdiction as originally exercised over the same matter.'   3 Comp. Laws 1929, § 15519 (Stat. Ann. § 27.2619).

"In *People, ex rel. Campau,* v. *Wayne Circuit Court,* 11 Mich. 393 (83 Am. Dec. 754), it was stated, quoting syllabus:

" 'Under our probate system, a very large portion of the old equity jurisdiction is vested in the courts of probate; and it seems that the court of chancery has jurisdiction in those cases only in which an adequate remedy does not exist in the probate court.'

"See, also, *In re Estate of Andrews,* 92 Mich. 449 (17 L. R. A. 296).

"The case at bar involved a fiduciary relationship incapable of being adjudicated in the probate court and presenting a proper subject for application of principles available only in a court of equity."

As the present case involves the fiduciary relationship between Ruppert and his employer and his participation in the alleged conspiracy, the claims of plaintiff and General Motors against the Ruppert estate could properly be considered and determined in the present chancery suit. Under the facts and circumstances shown, defendant Ruppert's contention that her deceased husband was a *bona fide* purchaser of an interest in the Burch patents is without merit.

The testimony indicates that if plaintiff had owned the Burch patents, under its agreement with General Motors it would not have charged royalties for spring constructions manufactured and sold to it under such patents. It also appears that the royalties which plaintiff paid to General Motors for sublicenses to manufacture under the Burch patents were included in the sale price which plaintiff charged other manufacturers. Because of these facts, the individual defendants argue that plaintiff has not sustained any money loss or damage and, therefore, is not entitled to recover. To hold with such argument would be to put the stamp of approval upon defendant executives' and Ruppert's conspiracy and their breach of duty to their respective employers. The law is established that plaintiff and General Motors, without showing that they sustained monetary damage or loss, are entitled to recover the profits which the individual defendants and Ruppert and Burch made through their conspiracy, breaches of duty, and wrongdoings.

"It was not necessary for plaintiff to show that it suffered detriment, injury, or damage. The law was indubitably contravened by the creation of a situation which lent inducement or temptation for wrongdoing; and a court of equity does not concern itself with the question whether the opportunity was embraced and the principal suffered actual injury." *Pratt* v. *Shell Petroleum Corp., supra,* p. 837.

"Directors and officers occupy toward stockholders what is commonly characterized as a fiduciary relationship. * * * It is immaterial that their dealings may not have caused a loss or been harmful to the corporation; the test of liability is whether they have unjustly gained enrichment." *Bailey* v. *Jacobs,* 325 Pa. 187, 194 (189 Atl. 320).

"The rule stands on the moral obligation to refrain from placing one's self in positions which ordinarily excite conflicts between self-interest and integrity. * * * It was defendant's failure to disclose his knowledge and give the timber company and plaintiff an opportunity to purchase which was wrong. Such being the case, it is immaterial whether or not the employer would in fact have bought the land." *Whitten* v. *Wright, supra,* pp. 426, 428.

See, also, *American Circular Loom Co.* v. *Wilson, supra; Irving Trust Co.* v. *Deutsch, supra; Chicago College of Osteopathy* v. *Littlejohn,* 234 Mich. 528; *Michigan Crown Fender Co.* v. *Welch, supra; Beaudette* v. *Graham,* 267 Mass. 7 (165 N. E. 671); *Averill* v. *Barber,* 2 Silvernail, 40 (6 N. Y. Supp. 255).

In breach of his duty to his employer, Ruppert was a willing and active conspirator with the defendant executives and Burch in secretly acquiring interests in the Burch patents and royalties. From such wrongfully acquired interests, defendant executives and Ruppert (and his estate) each received more than $30,000 from the royalties paid by

General Motors. Knowing that he was dealing with trusted executives of plaintiff corporation and General Motors, and knowing or being presumed to know the duties which they owed their respective employers and their breach of such duties, Fred Burch was a willing and active party to the conspiracy. As assignee of her deceased husband's 10 per cent. interest in the patents and as successor trustee, defendant Elizabeth Burch personally benefited and actively participated in the wrongdoings of the other individual defendants. As successor trustee she received and distributed royalties in the amount of $102,980.23 to herself and other individual defendants. Because of their breaches of duty and their conspiracy and wrongdoings, defendant executives, Elizabeth Burch, and Albert A. Ruppert whose estate is represented by defendant Mabel C. Ruppert, administratrix, became jointly and severally liable to plaintiff and General Motors for all profits which they received from the Burch patents. In 3 Scott on Trusts, p. 2429, § 506, it is stated:

"Liabilities of third persons. Where a person in a fiduciary relation to another violates his duty as fiduciary, a third person who participates in the violation of duty is liable to the beneficiary. If the third person makes a profit through such participation, he is chargeable as constructive trustee of the profit so made."

In the case of *Irving Trust Co.* v. *Deutsch, supra,* the circuit court of appeals said, p. 125:

"One who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise."

See, also, *Jackson* v. *Smith,* 254 U. S. 586 (41 Sup. Ct. 200, 65 L. Ed. 418) ; *Emery* v. *Parrott,* 107 Mass. 95 ; 15 C. J. S. p. 1028, § 18 ; 11 Am. Jur. p. 578, § 45.

We find no evidence justifying a decree against defendant Austin G. Van Hove. His principal activity appears to have been assisting his aunt, defendant Elizabeth Burch, trustee, in her collection and distribution of royalties. He was not a party to the alleged conspiracy, nor did he receive any part of the royalties from the Burch patents. Plaintiff's bills and General Motors' cross bills against said Austin G. Van Hove should be dismissed.

The testimony is undisputed that General Motors would not have executed the license agreements with Burch and would not have paid royalties to Burch and his wife as trustees had it known that its trim engineer Ruppert was sharing in such royalties. As it had been induced by the wrongdoing of its employee Ruppert in conspiracy with the defendant executives, who were plaintiff's employees, to enter into the two license agreements with Burch and to pay royalties thereunder, General Motors is equitably entitled to recover from the individual defendants (except Austin G. 'Van Hove) its actual loss and damage of $92,808, which is the difference between the royalties of $181,210.28 it paid under the Burch license agreements, and sublicense royalties of $88,402.28 which it collected from plaintiff and others.

The expense incident to obtaining the two Burch patents was approximately $2,000, and deducting such sum from the total royalties of $181,210.28 collected by Burch and wife as trustees, leaves a balance of $179,210.28, which represents the net profit realized from the two patents by the defendant executives, Ruppert and his estate, and said

Fred Burch and Elizabeth Burch. Deducting General Motors' loss of $92,808 from such net profit of $179,210.28 leaves a balance of $86,402.28, which amount, for the reasons herein stated, plaintiff is equitably entitled to recover from the individual defendants (except Austin G. Van Hove).

We conclude that the individual defendants, Thomas Mahoney, William A. Falls, Newton E. Shockey, Desire H. Van Hove, Elizabeth Burch, and Mabel C. Ruppert, administratrix, hold said net royalties or profits of $179,210.28 as trustees *ex maleficio* for the use and benefit of plaintiff Young corporation and cross plaintiff General Motors Corporation. Plaintiff shall recover from said individual defendants, or any of them, the sum of $86,402.28, and cross plaintiff General Motors shall recover from said individual defendants, or any of them, the sum of $92,808.

This being a chancery action to recover for the alleged breach of duty and wrongdoing of the individual defendants and others, the allowance of interest is discretionary. 25 C. J. S. p. 545, § 54. In endeavoring to reach an equitable conclusion under all the facts and circumstances shown, we hold that plaintiff and cross plaintiff General Motors shall recover interest at five per cent. on the respective sums decreed to them, only from the date of the entry of a decree herein until such sums are paid. Defendant Elizabeth Burch as trustee and the individual defendants shall execute proper assignment and transfer of the first Burch patent to plaintiff. In view of our conclusions, other questions presented do not require consideration.

The decree of the trial court, except as it relates to defendant Austin G. Van Hove, is vacated and set aside. A decree may be entered in this court in accordance with this opinion.

Plaintiff and cross plaintiff General Motors shall recover their costs from the individual defendants, except Austin G. Van Hove.  Said Austin G. Van Hove shall recover his costs from plaintiff and General Motors.

BOYLES, C. J., and CHANDLER, NORTH, BUSHNELL, and SHARPE, JJ., concurred with STARR, J.  WIEST, J., concurred in the result.  BUTZEL, J., did not sit.