## COLD METAL PROCESS CO. v. McLOUTH STEEL CORPORATION.

### Civ. A. No. 1686.

District Court, E. D. Michigan, S. D.

July 18, 1946.

Butzel, Eaman, Long, Gust & Bills, of Detroit, Mich., Manchester, Ford, Bennett & Powers, of Youngstown, Ohio, and Stebbins, Blenko & Webb, of Pittsburgh, Pa., for plaintiff.

Dickinson, Wright, Davis, McKean & Cudlip, of Detroit, Mich. (William B. Cudlip and T. Donald Wade, both of Detroit, Mich., of counsel), for defendant.

PICARD, District Judge.

This cause comes before the Court upon exceptions filed by both parties to the report of a Special Master upon an accounting of patent license royalties due to plaintiff herein. It is essentially an action to recover royalties stipulated in a patent license contract entered into between plaintiff and defendant, April 30, 1934, covering hot and cold mills for rolling metal upon which plaintiff owned patents and which were subsequently installed by defendant. Numerous defenses to the claimed liability for royalties were urged by defendant in its answer. A lengthy trial of the merits was heretofore held before this Court, which reached the conclusion, 41 F.Supp. 487, that defendant was obligated to pay royalties on both mills. However, we held that as to the hot mill defendant was entitled, by virtue of an equal treatment provision in its contract, to the benefit of a clause in a license agreement that had been entered into between plaintiff and Youngstown Sheet and Tube Company, January 30, 1934, which clause provided in substance that if de-

fendant's hot roll mill should prove not to be commercially successful or if the results should compare unfavorably with those obtained by competitors using continuous hot rolling mills the stipulated royalties on low carbon steel should be reviewed and any reductions warranted by the circumstances, made. Accordingly, by order of March 23, 1942, this court referred the matter to a Special Master to hear testimony upon and to determine what reduction, if any, should be made in the hot mill royalty rates set forth in the 1934 plaintiff-defendant agreement in the light of all relevant circumstances, a number of which were enumerated in the order of reference. The Master was further directed to make an accounting of royalties due plaintiff in accordance with his conclusions and subsequently held hearings, filing his report December 7, 1943. Thereafter, further proceedings in the case were suspended as a result of the operation of the Patent Royalty Adjustment Act enacted in 1942, 35 U.S.C.A. §§ 89–96.

This Court has carefully studied the Master's report, the lengthy briefs filed by the parties upon the exceptions thereto, has heard oral arguments thereon, and has carefully considered the issues. The major question, of course, relates to the reduction of royalties on the hot mill under the 1934 Youngstown contract which this Court has held became incorporated into and part of the contract between plaintiff and defendant as a result of the operation of the Cold Metal-McLouth equal treatment provision. The Master reached the conclusion that in the light of relevant circumstances the royalties stipulated in the contract should be reduced 50 per cent. Both parties claim that the Master's conclusion was erroneous, defendant urging that royalties should be reduced to the point of extinction and plaintiff that they should not be reduced at all.

One of the reasons urged by defendant in support of its claim that the hot mill royalties should be reduced to zero is that the mill produces a product which is inferior in quality by comparison with that of continuous hot mills and which defendant accordingly cannot sell for a number of purposes in competition with continuous mills. Therefore, it contends that if the product had been of the quality required defendant could have sold substantially more hot strip than it did within the limits of the capacity of the mill, and which it claims is 110,000 tons per year. And reasoning further defendant claims that if it had made such additional sales it would have realized further profits exceeding in each year the amount of royalties due plaintiff under the contract. Accordingly, it argues, it sustained damage in terms of lost profits in excess of the stipulated royalties, due solely to the inferiority of the product of the mill, and the royalties should therefore be reduced to zero.

[1] This Court is unable to agree with the reasoning of defendant. The record shows that the original 1934 agreement between the parties contained a warranty of production on the reversing hot mill sold to defendant of 2,000 tons of hot strip per month or 24,000 tons per year. It is clear that at that time the parties did not contemplate a production remotely approaching 110,000 tons per year. In fact, in 1937, approximately three years after execution of the original contract, defendant itself, in a laudatory prospectus, claimed capacity of the hot mill to be 72,000 tons per year. Since the beginning of 1937, when the obligation to pay royalties commenced under terms of a supplemental agreement entered into by the parties during that year, defendant has never rolled and sold less than 42,000 tons per year on the hot mill and in each of two of the five years covered by the accounting the production exceeded 90,000 tons. Defendant concedes that it sells its hot strip at the same prices as the allegedly superior product of its competitors using continuous mills, and it makes no claim that its unit costs of production are greater than those of its competitors. Since defendant has been able to sell a much greater production of hot strip than was promised by plaintiff at no financial sacrifice, it is clear that it has suffered no injury from the claimed inferiority of product. In view of this, the mere fact that defendant might have sold a greater production than it did if its product had been of the same quality as that of the continuous mills does not

establish any compensable damage to it. Actually, defendant obtained a much better machine from a commercial standpoint than it bargained for, regardless of any element of inferiority of steel. The record shows that it has made very large profits from the mill, whereas if its mill had been capable of producing only 24,000 tons of the finest grade of steel it would at best have made only a modest profit.

Furthermore, when defendant discovered, as it claims it did by 1937, that the product of its mill was not on a par with that of continuous mills it did not discontinue using the machine. Instead, it went on to pile up large profits from its use and now is not willing to pay any of the royalties it contracted for. Such a result would be clearly inequitable.

For the reasons stated, we are clearly of the opinion that defendant is not entitled to elimination of its hot mill royalties by application of the reduction clause of the 1934 Youngstown contract.

Turning now to the recommendation of the Master, it appears that he adopted an equitable approach to the problem of reducing royalties. The Master recognized the factors heretofore pointed out, but undoubtedly felt that in view of the inferiority of defendant's product, added to the fact that plaintiff had voluntarily cancelled royalty obligations on the only other reversing hot mill on this continent (Canada) defendant was entitled to some reduction in royalties and so recommended they be cut in half. This Court anticipates that the Master's conclusion is in general an equitable and fair measure of what the parties should be willing to accept. However, this being a lawsuit, the decision of the Court as to reduction of royalties must be based upon principles of law and not upon the arbitrary viewpoint of the Court or the Master. After a careful study of the record, we find no support in the evidence for the precise reduction recommended. In fact this Court is firmly of the opinion that the royalties should either be left to stand as stipulated in the original contract or eliminated entirely. We find therefore that the conclusion of the Master reducing the same 50 per cent is arbitrary and erroneous as a matter of law.

We now approach the legal effect of the "equal treatment" clause contained in the Cold Metal-McLouth contract, it being apparent that if the issue were solely one of lost profits to McLouth we would hold that royalties should not be reduced at all for the reasons heretofore stated.

But the "equal treatment" clause complicates the matter for here defendant advances the claim that it is entitled to have royalties on its reversing hot mill reduced to zero by operation of the "equal treatment" clause contained in the 1934 Youngstown contract. The issue thus raised requires careful examination of the provisions of four different contracts: that between plaintiff and defendant; the 1934 Youngstown contract; the 1933 agreement entered into between plaintiff and Dominion Foundries and Steel, Ltd., Ontario, Canada; and the terms of settlement between plaintiff and Carnegie-Illinois Steel Corp. executed in 1940.

The Cold Metal-McLouth contract of 1934 provided: "In the event that Cold Metal shall, at any time during the life of this agreement, grant to another licensee in the United States, for the manufacture of the same material herein contemplated, on Cold Metal single stand reversing mills, a more favorable rate than the rates herein required, the royalty rate for this license shall at the same time be reduced to said more favorable rate and shall continue at said more favorable rate during the remaining life of this license, * * *".

The 1934 agreement between Cold Metal and Youngstown provided: "In the event that Cold Metal shall, at any time during the life of this agreement, grant to another licensee in the United States for the hot rolling of low carbon steel, or for the hot rolling OF ANY OTHER STEEL covered by this agreement, a more favorable rate than the rates herein required, * * * the royalty rates for this license shall, at the same time be reduced to said more favorable rates, * * *." (Capitals ours.)

The 1933 contract between Cold Metal and Dominion Foundries and Steel, Ltd.,

provided that: "In the event that Cold Metal shall at any time during the life of this agreement, grant to another licensee in the Dominion of Canada or the United States of America, for the manufacture of the same material herein contemplated, a more favorable rate than the rates herein required, the license rate for this license shall at the same time be reduced to said more favorable rate and shall continue at said more favorable rate during the remaining life of this license."

It is well to note that the Dominion contract covered a hot roll reversing mill.

We must add to these three provisions certain terms of an agreement entered into in 1940 between Cold Metal and Carnegie-Illinois terminating litigation instituted by Cold Metal against Carnegie-Illinois in which it claimed that operation of continuous hot mills by the latter infringed certain Cold Metal patents. In that agreement it was specifically provided that no royalties should be paid by Carnegie-Illinois to Cold Metal "ON ANY STEEL ON ACCOUNT OF HOT ROLLING." (Capitals ours.)

Now, while McLouth was not directly entitled to the zero royalty rates thus created, because Carnegie-Illinois never obtained the right to use the Cold Metal "reversing hot" mill patents to which the McLouth equal treatment clause is limited in its operation, nevertheless, McLouth was entitled to the benefit of any more favorable rates which were granted to Youngstown and Youngstown under the 1934 contract between it and Cold Metal was entitled to equal treatment relative to its reversing hot mill. The issue is thus presented as to whether Youngstown as a result of the settlement between Cold Metal and Carnegie-Illinois did acquire the right to roll hot strip on the reversing hot mill without payment of any royalties, which in turn would result in McLouth obtaining the same right derivatively from the Youngstown contract.

■ We must answer this in the affirmative. Paragraph (i) of the 1934 Youngstown contract provided that if Cold Metal should grant to another licensee in the United States "for the hot rolling of low carbon steel, or for the hot rolling OF ANY OTHER STEEL covered by this agreement" (capitals ours) a more favorable rate than those stipulated in the Youngstown contract, Youngstown should have the benefit thereof. No comparable provision appears in the 1929 contract between Youngstown and Cold Metal, and accordingly this constituted an enlargement of the scope of the 1929 license to Youngstown to which McLouth became entitled under the express terms of its agreement with Cold Metal. But it will be noted that the most favored licensee clause in the 1934 Youngstown contract was not restricted in its operation to more favorable licenses for the reversing hot mill but rather gave Youngstown the benefit of any more favorable royalties for the "hot rolling of steel." Since zero rates of royalty were extended by Cold Metal to Carnegie-Illinois for the hot rolling of steel, Youngstown thereby became entitled under the terms of the equal treatment clause in its contract with Cold Metal to roll steel on its reversing hot mill without royalty payments. And since McLouth under its contract with Cold Metal was entitled to the benefit of any reduction in rates accruing to Youngstown, McLouth in turn became entitled to the same treatment—namely, zero rates of royalty on its reversing hot mill.

This Court might have more doubt about the correctness of its conclusion in this respect if it were not that plaintiff has interpreted one of its contracts in such a way as to confirm our construction of the most favored licensee clause in the 1934 Youngstown contract. Reading the McLouth and Dominion "favored licensee clauses" we find them practically the same. Therefore after its settlement agreement with Carnegie-Illinois, plaintiff felt obliged by reason of that provision to relieve Dominion of all obligation to pay royalties on the reversing hot mill. So the interpretation is not placed upon the contract by this Court; it is plaintiff's own interpretation.

It is recognized also that Youngstown never claimed the right to roll hot strip on its reversing hot mill without payment of royalties, but Youngstown had no occasion to make such claim since it had abandoned all use of the reversing hot mill in 1937. The test is not whether metal was actually

rolled by Youngstown at zero rates of royalty but whether Youngstown had the right to do so.

With respect to the issues involved in the accounting other than that of reduction of royalties, the Court has fully considered the arguments and authorities cited in briefs and oral arguments. We are of the opinion that the conclusions reached by the Master are correct and should be confirmed, except as hereafter indicated.

■ We turn first to the question of whether defendant should benefit retroactively from the lower royalty rates provided in the settlement agreement between Carnegie-Illinois and Cold Metal. While the Court believes that it might be equitable to make such rates retroactive, it appears that certain appellate courts have held to the contrary on fact situations closely resembling the case at bar. We therefore cannot say that the decision of the Master was erroneous. True the Court somewhat rebels at the thought that a patent infringer should gain advantage over a licensee, but it must be recognized that the infringer assumes risks as to the outcome of litigation which are not faced by the licensee.

■ The Court also believes that the Master's conclusion as to interest should be somewhat modified. It appears that plaintiff did not demand payment of royalties on the cold mill prior to institution of the present action, and that after defendant discontinued payments of hot mill royalties in June, 1939, there were negotiations between the parties as to reduction or settlement of royalties thereon, which continued until shortly before institution of this action. Consequently, the Court is of the opinion that the obligation to pay interest upon royalties should begin with the date this suit was commenced, namely, February 14, 1940. L. A. Young Spring & Wire Corp. v. Falls, 307 Mich. 69, 11 N.W.2d 329, is authority that the Court may use its discretion in allowing interest. Plaintiff through its counsel has agreed to waive interest for the period when defendant could not pay plaintiff royalties due to notification of defendant by the governmental agencies administering the Royalty Adjustment Act of 1942 not to make such payments, and the judgment accordingly should exclude interest for that period.

We hold therefore in this opinion:

(a) That defendant suffered no compensable damages as the result of the steel rolled on its reversing hot mill being inferior in grain and surface;

(b) That plaintiff is entitled to all the royalties granted it by the Master in his report on the cold roll mill;

(c) That while this Court believes that there should be at least a 50 per cent royalty paid by defendant to plaintiff on the "seconds" from the cold roll mill, he cannot find that the Master's conclusion is erroneous and, therefore, adopts the report.

(d) That plaintiff is entitled to interest from the day of starting of suit, except the interest on sums that have been placed in escrow as a result of action by the government agencies administering the Patent Royalty Adjustment Act of 1942.

(e) And finally, we hold that defendant is entitled to complete elimination of certain royalties upon its hot mill, not on the ground that the mill failed to produce the high type of steel produced upon continuous mills, but rather because of the effect of the Carnegie-Illinois settlement contract. However, such elimination of royalties should only commence with production on the McLouth mill from and after the date of the Carnegie-Illinois agreement, namely, August 30, 1940. Full royalties must be paid up to that date and if the parties are unable to agree upon the amount due the Master will be directed to make the computation.

The conclusion here reached is based upon further enlightenment since the filing of the Court's previous opinion, resulting from the Master's report, the evidence and the briefs, and arguments of counsel. If there is any conflict between the conclusions herein stated and those set forth in the previous opinion of the Court the latter may be deemed modified and amended to the extent of such conflict.

A judgment in conformity with the conclusions stated in this opinion may be prepared by the parties and submitted to the Court.