**COLD METAL PROCESS CO. et al. v. McLOUTH STEEL CORPORATION.**

Nos. 10522, 10523.

United States Court of Appeals
Sixth Circuit.

Oct. 4, 1948.

Rehearing Denied Nov. 29, 1948.

A. Hilliard Williams, of Detroit, Mich., and Wm. H. Webb, of Pittsburgh, Pa. (Wm. H. Webb, of Pittsburgh, Pa., Franklin B. Powers, of Youngstown, Ohio, and Thomas G. Long, Charles A. Wagner and A. Hilliard Williams, all of Detroit, Mich., on the brief), for appellants and cross-appellees.

Charles H. Walker, of New York City, and William B. Cudlip, of Detroit, Mich. (William B. Cudlip, R. William Rogers and T. Donald Wade, all of Detroit, Mich., on the brief), for appellee and cross-appellant.

Before HICKS, Chief Judge and SIMONS and ALLEN, Circuit Judges.

HICKS, Chief Judge.

The Cold Metal Process Company, herein called Cold Metal, brought an action by complaint and supplemental complaint upon a patent licensing agreement dated April 30, 1934, and herein called the Agreement, against McLouth Steel Corporation, to recover royalties for the use of two machines for rolling strip metal, one known as a "hot mill" and the other as a "cold mill." The other appellants are aligned with Cold Metal and no further mention need be made of them.

McLouth's main defenses were: That the Agreement was illegal and unenforceable because of control assumed by Cold Metal over the unpatented product and over equipment bought by McLouth under the Sales Agreement of April 30, 1934; that the hot mill did not produce satisfactory steel, thus raising the issue of failure of consideration; that McLouth was entitled to the benefits of the more favorable terms granted Youngstown Steel Metal and Tube Company (herein called Youngstown) whose 1929 agreement with Cold Metal had been specifically excepted from the operation of the most favored licensee clause of the agreement; and that the cold mill did not come within the scope of Patent No. 1,744,016, herein called No. '016.

There was a counterclaim by McLouth for hot mill royalties already paid, and for $10,000 paid Cold Metal at the time McLouth purchased its cold mill from a third party. This counterclaim was rejected by the court and has not been pursued here.

Subordinate defenses and issues will be referred to hereinafter.

A hearing was had before the District Court on October 1, 1941, 41 F.Supp. 487, and it ruled that the contractual requirements for the payment of royalties upon the product of the mills were not inconsistent with the outright sale of the mills to McLouth and that the Agreement of April 30, 1934 and the Accord of January 12, 1937, were lawful; that if McLouth did not know in 1934 that the reversing hot mill acquired by it was still in a state of experimentation it should have so known, and that in any event at the end of three years the hot mill was working satisfactorily so that a new agreement, the Accord of 1937, was made, and that the mill was operated at a substantial profit until June 1, 1939, the date upon which McLouth ceased to pay royalties. The court ruled touching an agreement made by Cold Metal with Youngstown in 1934 that there was no evidence that McLouth knew of its existence when entering its own 1934 Agreement; that the Youngstown agreement of 1934 had the effect of putting the reversing hot mill in an equal or competitive position with continuous hot mills, a position not accorded it by the terms of the 1929 Youngstown agreement; that McLouth was thereby entitled to any reduction in royalty rates which the operation of its mills and the quality and surface of its steel might warrant since it was undisputed that the results obtained on McLouth's reversing hot mill did not compare favorably with those obtained from continuous hot mills. The court directed that if the parties were not able to agree on royalty rates for the hot

mill from 1937, it would appoint a Master to determine what they should be. As to the cold mill, the court rejected McLouth's contention that it did not come within the scope of Patent No. '016 and concluded that McLouth was bound to pay royalties on the hot and cold mills, with the exception of whatever advantage might accrue to it from the 1934 Youngstown contract.

The Master so appointed held hearings and submitted a report on December 7, 1943, upon which the court ruled on July 18, 1946, D.C., 68 F.Supp. 112. Proceedings were suspended in the interim by court order by reason of the operation of the patent Royalty Adjustment Act of 1942, 35 U.S.C.A. §§ 89 to 96. We think it unnecessary to consider the Master's report, except incidentally, since the District Court on December 10, 1946 filed its own Findings of Fact and Conclusions of Law to which we shall refer.

The court reiterated that although McLouth spent large sums in perfecting the hot mill, it should have known that the mill was in an experimental state and that differences over liabilities due to the imperfect condition of the mill were composed by the Accord of January 12, 1937. The court repeated that the cold mill was under patent No. '016 under which McLouth was licensed and that by the supplemental agreement of June 25, 1937 both parties expected royalties to be paid on its products. It repeated that both the Agreement and the Accord were valid and binding contracts. However, the court rejected the Master's conclusion that McLouth's royalties should be reduced 50% on the hot mill because of its unfavorable competitive position with the continuous hot mills. It found that McLouth had actually been able to sell a much greater production of hot strip than Cold Metal had promised at prices equal to the alleged superior product of its competitors using continuous mills; that it suffered no damage, was entitled to no reduction by application of the reduction clause in Paragraph II(g) of the 1934 Youngstown contract.

McLouth then contended that it was entitled to elimination of royalties on its hot mill by operation of Paragraph II(i) of the 1934 Youngstown contract which gave Youngstown the benefit of any "more favorable rate" granted another licensee "for the hot rolling of low carbon steel, or any other steel covered by this agreement." The court found that Cold Metal in terminating litigation on August 30, 1940 with another licensee, Carnegie-Illinois Steel Corporation, (herein called Carnegie),—not licensed upon any patent reading upon McLouth's reversing hot mill,—had stipulated that Carnegie should thereafter pay no royalties "on any steel on account of hot rolling" and that cold rolling rates should be materially reduced. It further found that because of the wording in the Youngstown agreement of 1934, Youngstown became entitled to hot roll steel on its reversing mill at zero rates even though it abandoned the use of that mill in 1937; and that because Youngstown so benefited, McLouth might after August 30, 1940, also hot roll steel at zero rates and obtain the benefit, but not retroactively, of lower cold rolling rates granted Carnegie.

The court observed that Cold Metal had placed the same interpretation on its 1933 agreement with Dominion, a Canadian firm, operating a reversing hot mill.

The court further found that McLouth was entitled to benefit from the definition of low carbon simple steel, namely, steel containing a .60% carbon or less, granted Youngstown in 1934, rather than that containing .25% found in its agreement of April 1934; and that all hot mill royalties for which McLouth was liable prior to August 30, 1940, should be calculated upon the more favorable .60% definition.

The court allowed interest only from date of suit, or due date of the royalties, whichever was later, for the reason that after discontinuance of the hot mill royalties negotiations for a reduction of settlement of royalties were in progress until that date. The court deducted interest on royalties during the period of the Royalties Adjustment Act.

Based upon these findings it was decreed that McLouth, who paid royalties of $111,-566.78 on the hot mill to August 30, 1940, the date of the settlement with Carnegie with interest at 5% from February 14, 1940, the date of suit, or the due date,

whichever was later, and to pay royalties of $113,168 upon the cold mill to March 31, 1942, the date fixed by the Master, royalties being figured at the rate fixed in the agreement to August 30, 1940, and thereafter at the rate fixed in the Carnegie license and interest to be computed as for the hot mill from February 14, 1940, or due date, whichever was later.

The decree did not allow interest from August 13, 1943 to January 15, 1945, the effective period of the Royalty Adjustment Act. Interest was also deducted upon $90,000 which McLouth was required to deposit as security for the stay of proceedings due to the operation of the Royalty Adjustment Act.

Anticipating deductions in its 1946 income tax, McLouth on December 13th of that year paid into court the amount of the judgment against it with the reservation that it would not be prejudiced by such payment upon its appeal.

Both parties appealed.

The major issues on the appeal are,—(1) the effect of the reduction of the royalties in the Carnegie settlement upon the Youngstown agreements and indirectly upon the McLouth Agreement; (2) the dates from which interest should be calculated and the amounts upon which it was due; and (3) whether McLouth was entitled to the benefit of .60% definition of low carbon steel by reason of the inclusion of that definition in the Youngstown agreement of January 1934.

On the cross-appeal the major issues are,—(1) whether the Agreement was unlawful and unenforceable; and (2) whether the McLouth cold mill was covered by Patent No. '016, owned by Cold Metal.

Something should be said touching the use of the mills here involved in the reduction of steel slabs and strip. They involve the use of a set of rollers between which the material is passed and the rollers are so mounted that they exert great pressure upon the material, thereby reducing it in thickness and in certain instances giving it a smoother finish. Originally, the rolling process involved the use of much manual labor in handling the steel sheets. The mills here involved require little manual assistance. The hot mill reduces the slabs, as they come from the furnace, to strip before the metal has had time to cool. There are two types of hot mills,—(1) the continuous mill, which has several sets of rollers, mounted in sequence or "tandem" and because of the roll tables between the mill stands, they require much room for installation and through each mill the material is passed in a continuous coordinate operation; and (2) McLouth's reversing mill, which utilizes only one set of rollers through which the material is passed back and forth. In the use of this mill before the slab became thin enough to coil, it would pass on to roll tables on either side of the mill stand and as it became thinner and could be coiled it would be diverted into winders or reels which were constructed to retain the heat of the material during the operation.

The cold mills designed and used for reducing and smoothing strip utilized the reversing principle and a single mill stand which usually consisted of pressure rollers, small in diameter, backed above and below by rollers much larger in diameter which gave them support as they revolved. The cold mill was driven in part by power applied to the rollers and in part by power applied to the winding reels, the latter application having the effect of drawing the strip through the rollers.

McLouth's hot mill was of the reversing type; and its cold mill, one in which more than 50% of the driving power was applied to the rollers themselves and a smaller percentage (14% to 42%) of the winding reels.

Cold Metal was organized in 1926 about the time that these new mills were being developed. It became the assignee of patents thereon and went into the business of demonstrating them and of licensing people to use the equipment and processes they covered. It also had a plant where it built appliances of smaller size.

Donald V. McLouth, President of McLouth, prior to 1934 had been in the business of selling steel and about that time he became interested in the steel manufacturing business. He was told about Cold Metal's reversing hot mill by Mr. Dillon, a

Cold Metal salesman. Through Dillon he met other representatives of Cold Metal, including Mr. Montgomery, the Chief Engineer, and he testified that Montgomery represented that they had a one stand reversing mill with furnaces to maintain temperature which was cheap in construction, at a small installation cost, and would turn out a "product competitive with the industry." McLouth made a trip to observe the experimental reversing hot mill which Cold Metal had been developing with the collaboration of Youngstown. McLouth testified that he was not satisfied with the surface produced on the strip by that mill; that he emphasized that he knew nothing about manufacturing and would have to depend on the Cold Metal people; that he was advised that that mill was not constructed to do that job but had been thrown together from equipment designed for other uses and that its operation could be improved and a commercial surface achieved.

As a result of the negotiations, McLouth was organized and on April 30, 1934 entered into two contracts with Cold Metal, the one being a sales agreement for the purchase by McLouth of the hot mill, and by the other, the Agreement, Cold Metal licensed McLouth to "own for itself" and use "one hot mill and two cold mills" and McLouth agreed to pay specified royalties per ton of strip purchased thereon.

The sales agreement was a somewhat involved document, occasioned by certain facts. The MacIntosh-Hemphill Company was to build the hot mill to be acquired by McLouth and certain other companies were to supply accessory items. McLouth's financial condition necessitated a guarantee by Cold Metal of payment of the purchase price to the equipping companies and there was included in the document certain clauses for re-possession and sale by Cold Metal in case of McLouth's inability to pay. In the preamble it was "mutually conceded" that "Cold Metal is the owner of certain patents covering hot and cold rolling strip steel * * * and produces and sells mills adapted to said processes"; and that McLouth desired to purchase one of said mills and "to execute a license agreement covering the use thereof." In clause Fifth, Cold Metal guaranteed the mill "to be capa-

ble of producing from slabs of low carbon simple steel * * *, a minimum of two thousand * * * net tons of hot rolled strip in coils of suitable quality and surface for sale as commercial hot roll strip steel * * *, per month of twenty-five * * * days. * * *" In Sec. A thereunder, Cold Metal was allowed full supervision of the initial operation of the mill for a period up to 90 days to produce satisfactory surface, and in Sec. C McLouth agreed to specify certain prescribed widths and guage for at least 2,000 tons, "before Cold Metal shall be expected to deliver commercial hot rolled strip for use other than cold rolling; this to enable Cold Metal to have sufficient time and opportunity to develop a commercial surface." The Ninth clause provided in part that "In the event that Cold Metal shall fail within ninety * * * days after installation of the mill to make good on its guaranty * * * in the Fifth Item herein, and *McLouth shall elect to treat said failure as a default in performance,* or a breach of this contract by Cold Metal, then McLouth shall be limited in its remedy therefor to the right to require Cold Metal to remove said mill and equipment from said premises; and Cold Metal * * * shall proceed * * * to remove said mill * * * and further repay to McLouth all payments thus far made by McLouth on the stipulated purchase price. * * *" In the Eleventh it was provided, "The use of the said mill, and of the processes covered * * * by Cold Metal * * * shall be governed by a license agreement to be executed by the parties hereto. * * *" (Italics ours.)

The instrument just referred to, to wit, the Agreement, was executed on the same day. Under its first "Whereas," Cold Metal was declared to be the owner of certain patents and applications "relating to the rolling of Metal Strip" including application No. 535,029 which culminated in the issue of basic patent No. 1,977,214. In Sec. I the term "Cold Metal Equipment" was stated to refer to equipment, the use, or the product, covered by any of the recited patents or applications and "low carbon simple steel" was defined as a simple steel having a carbon content of .25% or under

and high carbon steel as having a carbon content higher than that. By Sec. II McLouth was granted non-exclusive right and license "to own for itself, Cold Metal equipment including 'one (1) Cold Metal hot mill and two (2) Cold Metal cold mills, and to use the same for the rolling of iron and steel and to sell the product thereof * * *" under certain conditions. Subsec. (a) outlined conditions for the pricing of machinery to be sold to McLouth, and sub-sec. (b) set out royalty rates for various thicknesses and types of steel to be rolled on each type of mill. Sub-sec. (c) allowed Cold Metal access on occasion to its property and (d) permitted the affixing of name plates. Because of McLouth's contention that the Agreement is illegal we quote subsection (e) at length: "The license hereby granted is personal to McLouth and its successors in business, and/or the assignee of its entire business, and it is not otherwise assignable. McLouth agrees that it will not sell or transfer the Cold Metal equipment or any part of it except to a successor in business or to an assignee of its entire plant in which the Cold Metal equipment is used, and upon any sale or transfer or attempted sale or transfer except to * * * an assignee of its entire plant in which the Cold Metal equipment is used, the license to use said equipment shall thereupon automatically cease and determine."

Sub-section (f) provided for licenses under new patents, reissues, renewals, etc.; and for the continuation of the licenses through such contingencies; and sub-section (g) provided the conditions which would obtain in case patents covering equipment or processes or products used under the license were declared invalid. Sub-section (h) is critical and is quoted at length: "In the event that Cold Metal shall, at any time during the life of this agreement, grant to another licensee in the United States, for the manufacture of the same material herein contemplated, on Cold Metal single stand reversing mills, a more favorable rate than the rates herein required the royalty rate for this license shall at the same time be reduced to said more favorable rate and shall continue at said more favorable rate during the remaining life of this license, * * * It is understood by McLouth that Cold Metal has heretofore granted a certain license to * * * Youngstown * * *, dated December 10, 1929, covering the purchase and use of Cold Metal hot mills and the sale of the product thereof, at more favorable royalty rates than in this license; and the operation of said license shall not be considered as being a grant by Cold Metal of a more favorable license to third parties during the life of this agreement than is hereby granted to McLouth. Cold Metal agrees, however, that in the granting of any further license to * * * Youngstown * * *, the provisions of this paragraph shall be operative, and that it will not enlarge the scope of said license dated December 10, 1929, at terms more favorable than those herein established without extending such terms to McLouth. Cold Metal shall promptly disclose to McLouth the fact of the granting of any license in the United States during the life of this agreement for the *same material* at a more favorable rate than the rates herein required." (Italics ours.)

The concluding Sec. V bears on the contention that the Agreement is illegal. It reads,—"This license shall inure to the benefit of and be binding upon Cold Metal and its successors in business or an assignee of its entire business and shall inure to the benefit of and be binding upon McLouth and its successors in business or an assignee of its entire business."

It is conceded by Cold Metal that the reversing hot mill did not operate satisfactorily and did not produce satisfactory strip at first. The record before the Master bears upon its deficiencies and those of its products. Cold Metal says, "Various difficulties arose during the early operation of the mill through 1935 and the first months of 1936 operation was intermittent and a number of changes were made in the mill." Byrn, general superintendent of McLouth, testified that no part of the mill, other than the double rollers, was the same at the end of the readying period but Cold Metal points out that the rate of production granted by it was reached and passed during that time and cites a letter from McLouth to that effect. Likewise, in July of

1937 McLouth issued a Prospectus in furtherance of a sale of stock to the public. One paragraph thereof read,—"In 1934 the Company began the installation of a new type of hot rolling strip mill, which in subsequent months was thoroughly tested and perfected, and which the management now regards as satisfactory. The mill has operated efficiently for a period of more than twelve months and produces a commercially standard product. Similar mills are now being successfully operated by Youngstown * * * and by Dominion Foundries & Steel Ltd., Hamilton, Ontario."

This prospectus forms an important background to the case. The controversy was adjusted for a time by an agreement dated January 12, 1937, wherein it was stated in the preamble, among other things, that "McLouth has asserted a claim against Cold Metal for certain failure by Cold Metal of performance * * *," and that "Cold Metal has asserted a claim against McLouth for royalties under the terms of said agreement. * * * " In Sec. 2 it was stated, "McLouth and Cold Metal mutually forever discharge and release each other from all the duties and liabilities set forth in or arising from the aforementioned Agreement of Sale and further mutually release and surrender to each other any and all rights, claims and demands accruing under the terms and provisions of said Agreement of Sale. * * *" And in Sec. 3 it was provided, "Cold Metal releases and discharges McLouth from any and all liability for royalties on hot strip steel rolled by McLouth on its hot mill at any time prior to January 1, 1937."

But the controversy flared again on June 1, 1939, when McLouth declined to pay further royalties. The Master found that the royalties on the hot mill should be reduced by 50% because of the inferiority of the product both in its grain and its surface. There was evidence that McLouth's hot mill strip although saleable was restricted by purchasers to uses where the surface portions were not too important. The court rejected the Master's recommendation because it seemed to be equitable in its nature, whereas the suit was at law upon contract and the applicable relief was either the payment of royalties in full or their elimination altogether. However, there were other provisions in the contract relating to the concessions which might be given to Youngstown. The first license contract between Cold Metal and Youngstown was executed on December 10, 1929. It related to a 4-high Steckel (reversing) mill for hot rolling strip to be installed by Youngstown, at its Brier Hill plant. Cold Metal was to be in control of its operation in an obviously experimental and developmental project. Youngstown was to furnish power and slabs. On certain conditions Youngstown was, by terms of the contract, to be permitted to roll 100,000 tons without payment of royalties and the next 280,000 tons at a rate 50% of that charged other companies "for the use of the above described inventions for hot rolling the same or like products." Paragraph 8 provided in part, "It is understood that the licenses herein provided for are intended to cover *low carbon simple steel products such as are now being marketed by Youngstown. * * *"* (Italics ours.)

McLouth knew of this 1929 contract with Youngstown when it entered into the Agreement for it was explicitly referred to therein and the advantages granted to Youngstown were expressly denied to McLouth but at the time McLouth entered into its Agreement with Cold Metal, on April 30, 1934, Cold Metal had already entered into further agreements with Youngstown one on June 4, 1932, and another on January 30, 1934. There were differences of opinion as to whether McLouth knew of the existence of the January 1934 contract. Its president denied any knowledge thereof. Cold Metal introduced a letter to McLouth in which a vague reference was made to the closing of a contract by Cold Metal with Youngstown. We think that it is a fair inference that McLouth had no detailed knowledge of its terms or reference would have been made thereto in its own Agreement later that year with Cold Metal. If this later agreement (January 30, 1934) with Youngstown enlarged the scope of the earlier one and resulted in advantage to Youngstown, Cold Metal was required under Sec. II(h) of the Agreement with McLouth to extend the same advantages to McLouth.

The agreement of January 30, 1934 recited the assistance rendered by Youngstown in the development of the reversing hot mill and of Youngstown's desire to acquire such equipment, and a license under the covering patents. Sec. I(a) thereof contained certain explicit language on the definition of "low carbon steel" which we quote:

"* * * 'Low carbon steel' shall for the purpose of this agreement be deemed to be a steel containing not over the following percentages of elements:

| | |
|---|---|
| Carbon | .60% |
| Manganese | 1.50% |
| Silicon | .60% |
| Copper | .50% |

"It is understood that *if in the course of future developments and in the judgment of Youngstown it is necessary to add small percentages* of these or other materials to those now present in low carbon steel, *in order to meet competition on low carbon steels, then in that event Youngstown may add such materials and the resultant product will be classed for royalty purposes as low carbon steel.*" (Italics ours.)

Cold Metal in denying that Youngstown was extended any advantage by this definition over that of the December 10, 1929 contract emphasizes a portion of the first sentence of the paragraph immediately succeeding the provisions just quoted, namely, "The intent of this provision is, to protect Youngstown in the rights to hot roll any analysis of steel which it has commonly considered in the past to be low carbon steel and *the further right to change such analysis in the future to continue in the same manner to meet competition in the low carbon steel field.* * * *" (Italics ours.)

We shall consider later the definition of low carbon steel but for the entire picture we continue now with the recital of the salient portions of the contract of January 30, 1934. By Sec. II(b) Youngstown was given the right to roll "under this license" 100,000 tons of low carbon steel annually without payment of royalty, and an additional 776,000 at a rate equal to 50% of appended schedules similar to those appearing in the McLouth Agreement.

By Sec. II(g) Youngstown's position as a "pioneer" in developing Cold Metal's inventions and machinery for hot rolling steel was recognized and it was stated that both parties desired to render the same commercially successful. It was provided, however, that if at any time in a stated period Youngstown should doubt the commercial success of the inventions and machinery, the parties should review the subject and "in the event that Cold Metal's inventions and machinery are not commercially successful or in the event that results *compare unfavorably with the results being secured by competitors of Youngstown who are using 'continuous hot roll mills'* the parties shall review the royalties hereunder as to low carbon steel, only, and any reductions which the circumstances warrant shall be made in Youngstown's favor." (Italics ours.)

Sec. II(i) is critical and we quote it at length: "In the event that Cold Metal shall, at any time during the life of this agreement, grant to another licensee in the United States *for the hot rolling of low carbon steel, or for the hot rolling of any other steel covered by this agreement, a more favorable rate than the rates herein required * * * the royalty rates for this license shall, at the same time be reduced to said more favorable rates,* and Youngstown shall have the right to produce the aforesaid 776,000 tons * * * at Fifty Percent * * * of said reduced rates. * * *" (Italics ours.)

On the finding, which is supported by the evidence, that, despite any element of inferiority of steel produced, McLouth actually obtained a much better hot mill from a commercial standpoint than it bargained for, because the machine was capable of producing so much more saleable tonnage than was guaranteed for it, the court found that McLouth was not entitled to any reduction or elimination of hot mill royalties by application of Sec. II(g) of the 1934 Youngstown contract.

It found, however, on the other hand, that by reason of an agreement entered into between Cold Metal and Carnegie in 1940 McLouth was entitled to benefit from Sec. II(i) of the 1934 Youngstown agreement which we have just quoted. This

Carnegie agreement was executed on August 30, 1940, and grew out of a compromise of two infringement suits, one by Cold Metal against Carnegie and the other by Carnegie against Cold Metal. In Sec. III(4) of this, Carnegie agreement, royalties for cold rolled steel were fixed at rates decidedly lower than those set for McLouth in the Agreement. In sub-sec. (6) royalties "on any steel on account of hot rolling" were eliminated.

■ McLouth's contention, in which it was supported by the District Court, is that it is entitled to elimination of royalties on hot rolled steel after the date of the Carnegie agreement. Its reasoning is, that Cold Metal in the Agreement had promised it the benefit of more favorable rates which might be granted Youngstown over those fixed for it in the 1929 contract, and that in the 1934 contract with Youngstown, by Sec. II(i), it had promised Youngstown the benefit of any more favorable rates for hot rolling of low carbon or any other steel thereunder which it might grant any other licensee in the United States. If Youngstown benefited from the Carnegie contract, then McLouth contended that it should likewise so benefit.

We think this position is well taken, and that the Court's conclusion must be sustained.

Cold Metal's chief objection is that the concession promised Youngstown in the 1934 agreement was for reduced rates upon steel rolled upon a reversing hot mill, and not upon steel rolled upon a continuous hot mill such as Carnegie's. This position is not supported by the terms of the 1934 Youngstown contract. Looking at the whole instrument, and according to the terms thereof their obvious meaning, we think the intention is clear. So far as the record discloses, when this contract was made, there was only one other reversing hot mill on the continent, that licensed to the Dominion Foundries & Steel, Ltd., of Hamilton, Ontario, Canada, which may or may not have been in operation in 1934. In the preamble to the 1934 Youngstown agreement, express reference was made to the fact that Youngstown was assisting Cold Metal in "development" of a "reversing hot mill." The parties returned to that theme in sub-sec. II(g) wherein it was noted that Youngstown was in the position of a "pioneer" in the development of the application of Cold Metal's inventions to hot rolling of steel. In the very next sentence it appears that there were doubts, whether satisfactory application of the inventions could be made. Youngstown was given five years to present its doubts about the commercial success of the machinery to Cold Metal; provision was made for the review of the subject and if the results did not appear to be commercially successful and "in the event that results compare unfavorably with *the results being secured by competitors of Youngstown who are using 'continuous hot rolling mills'* * * * any reductions which the circumstances warrant shall be made in Youngstown's favor." (Italics ours.) In the light of the developmental stage of this art and of the provision just quoted, Cold Metal's contention is untenable. The language is clear and not subject to construction. The obvious intention was to make Youngstown's position a competitive one with all hot rolled steel, regardless of how rolled.

■ Sec. II(i) of the 1934 Youngstown contract, which follows almost immediately the section containing the line just quoted, states, "In the event that Cold Metal shall, at any time during the life of this agreement, grant to another licensee in the United States for the hot rolling of low carbon steel, or for the hot rolling of any other steel covered by this agreement, a more favorable rate * * * the royalty rates for this license shall, at the same time be reduced to said more favorable rates, and Youngstown shall have the right to produce * * * 776,000 tons * * * at Fifty Percent * * * of said reduced rate." In the light of the relationship obtaining between Cold Metal and Youngstown, when Carnegie rates on hot rolled steel were reduced to zero, by a literal reading of Sec. II(i) Youngstown's royalty rates would "at the same time" be reduced and it would immediately "have the right to produce" 776,000 tons at Fifty

Percent of zero. McLouth under sub-sec. (h) of its own Agreement with Cold Metal is entitled to the same advantage.

Cold Metal argues that in any event the 1934 contract with Youngstown did not "enlarge the scope" of the 1929 contract, and that hence McLouth was not entitled to any benefit from the Carnegie reduction of rates. It argued also that since Youngstown already had the right prior to the Carnegie settlement to roll 100,000 tons free of royalties, and since the record shows that McLouth's annual production never reached that figure, McLouth could not benefit by the reduction to Carnegie. We have examined these and other contentions made in opposition to the allowance of zero royalties on the hot mill and find them without merit.

Differences over the hot mill royalties from the date of the Agreement to January 12, 1937 were settled by the Accord of that date. McLouth has paid into the Registry of the Court hot mill royalties from the date of the Accord to that of the Carnegie settlement. A corollary question is, whether for this period, McLouth shall be entitled to read into the Agreement a dividing line between low and high carbon steels of .60%, in view of the terms of the agreement between Cold Metal and Youngstown, notwithstanding the dividing line of .25% set forth in its own Agreement with Cold Metal.

It is undisputed that Youngstown received the benefit of a .60% dividing line in its contract of January 30, 1934, and that the dividing line for McLouth was fixed at .25% in the Agreement. Under Sec. II(h) of the Agreement, McLouth would be entitled to the .60% dividing line, provided that figure were more favorable to Youngstown and represented an enlargement over the one fixed in its 1929 agreement.

In that document no figure was established, the only reference to the matter being found in Sec. 8 thereof, to wit: "It is understood that the licenses herein provided for are intended to cover low carbon simple steel products, *such as are now being marketed by Youngstown.* * * *" (Italics ours.)

In the 1934 contract, which set the dividing line at .60%, it was stated, "The intent of this provision is to protect Youngstown in the rights to hot roll any analysis of steel *which it has commonly considered in the past to be low carbon steel,* and the further right to change such analysis in the future to continue in the same manner to meet competition in the low carbon steel field." (Italics ours.)

■ ■ We do not think the language of these two clauses can be construed to arrive at the meaning of what was marketed by Youngstown as low carbon steel in 1929. That is a question of fact and was so understood by the court and the Master. The evidence adduced was not too satisfactory, consisting mostly of what was the practice in the industry and of what was Cold Metal's practice with reference to other licensees, all of which indicated an almost universal understanding that in the standard pricing schedules, extra pricing based upon carbon content commenced immediately above .25% carbon. No contrary evidence appears, and since there is some evidence to support the finding of the Master and of the court, and since it is not "clearly erroneous," we must accept it. Rule 52, Rules of Civil Procedure, 28 U.S.C.A. The .60% dividing line between low and high carbon steel fixed by Cold Metal in the 1934 contract with Youngstown, represented an enlargement over the 1929 contract and McLouth is entitled to the benefit of the enlargement in figuring its royalties upon hot rolled steel.

Consideration of the item of interest to be paid upon the judgment for hot mill royalties will be deferred and taken up in connection with the interest claim upon the cold mill royalties.

As we have observed, McLouth was granted under the Agreement a right and license to own for itself two Cold Metal cold mills. When the time came to purchase a cold mill, McLouth decided to acquire a type used by one of its competitors, a 4-high, part-drive, part-pull mill, upon which there is evidence it could obtain more prompt delivery if purchased from United Engineering and Foundry Company than from Cold Metal. Accordingly, on

June 25, 1937 it entered into a Supplemental Agreement with Cold Metal, the salient provisions of which were as follows: Cold Metal waived the provisions of Article II(a) of the Agreement, which obligated Cold Metal to "furnish" to McLouth and the latter to "obtain" from Cold Metal the machinery to be used under the license "to the extent that McLouth may purchase one (1) cold mill *for use under the License Agreement* from a source of its own choosing, rather than from Cold Metal." (Italics ours.) For this waiver McLouth agreed to pay Cold Metal $10,000. It was further stated, "Nothing contained herein shall constitute a waiver by Cold Metal of its rights under Article II, Section (a), of the License Agreement, beyond that above set forth." Then it was said in clause II, "As above modified, *the parties hereby ratify and confirm the License Agreement.*" (Italics ours.)

This mill was purchased from United Engineering and Foundry Company. Until date of suit McLouth paid no royalties upon the product thereof. However, a letter written by it on April 8, 1938, relative to the payment of the $10,000 acknowledged that the machine was purchased "for use under the License Agreement." And in a prospectus for the sale of Common Stock issued by McLouth under the date July 29, 1937 (about a month subsequent to the Supplemental Agreement) McLouth observed that expanding operations required the installation of a 4-high reversing cold mill. The following paragraph 9 thereof on "Royalties" is significant: "The Company operates its hot rolling mill, and will operate its cold rolling mill, *under license agreement,* dated April 30, 1934 and subsequently amended, with the Cold Metal Process Company * * * *whereby Cold Metal licensed the Company under certain patents, and the Company agreed to pay to Cold Metal monthly royalties on both hot and cold rolled strip steel.* The agreement provides that the license shall continue throughout the life of the patents or until they are held invalid." (Italics ours.)

McLouth contends that it is not liable to pay royalties on the cold mill on the ground that it was not covered by Cold Metal's Patent No. '016.

We recognize that in a proper case a licensee may go into the prior art for the purpose of construing a patent and showing that the structure complained of is not covered thereby. Pressed Steel Car Co. v. Union Pac. R. Co., 2 Cir., 270 F. 518; Sinko Tool & Mfg. Co. v. Casco Products Corp., 7 Cir., 89 F.2d 916.

But where, as here, a mill is specifically licensed and where there has been acknowledgment of the obligation to pay royalties on the licensed mill, and where the licensee has in its prospectus held itself out to the world as being licensed to operate its cold rolling mill, a different situation is presented. The distinction is discussed by this court in Kant-Skore Piston Co. v. Sinclair Mfg. Corp., 6 Cir., 32 F.2d 882, 885, certiorari denied 281 U.S. 735, 50 S.Ct. 249, 74 L.Ed. 1150, wherein it said: " * * * Defendant rests its case upon the proposition that royalties can never be payable under a license agreement upon articles which do not infringe. Without pausing to inquire into the soundness of plaintiff's counter proposition that all articles substantially embodying a patented concept are subject to royalty payments under a license even though they may not technically fall within the exact limitations of the patent, *we shall assume the correctness of defendant's contention as to articles for which the protection of the patent has not been claimed* and taken advantage of. * * *" (Italics ours.)

Here it occurs to us, McLouth contracted for the right to use the cold mill without molestation; and when it was important to it in the sale of its stock, held itself out, as having a license from Cold Metal to use its cold mill, (the cold mill it had bought from United) and as being obligated to pay royalties thereunder, it cannot now repudiate that license by claiming that the machine does not fall within the coverage of No. '016. "So long as defendant accepted the shelter of the agreement, it was required to pay the royalties." Wilcolator Co. v. Robertshaw Thermostat Co., D.C., 26 F.Supp. 255, 257.

What the situation would be had McLouth openly repudiated the applicability of No. '016 before the date of the suit, we

do not find it necessary to decide. We think the District Court properly found that McLouth was bound to pay royalties on its cold mill; and it is unnecessary to consider whether the cold mill came within the coverage of No. '016.

McLouth urges that the Agreement was unlawful and unenforceable (1) because of a provision therein which, it asserts, required it as licensee, to purchase only from the patentee unpatented parts of the assembly claimed to be covered by the patent and (2) because of a provision which, it asserts, prohibited it from selling or alienating the patented mills to which it claimed it had absolute title.

 These considerations were not, as Cold Metal points out, brought to the attention of the District Court and were not advanced as grounds for the appeal, other than under the general point that the court erred in finding and concluding that the license agreements were valid. The appellant cannot be permitted to raise for the first time on appeal questions which if raised below might have been met by the other side. Ford Motor Co. v. Chas. A. Myers, 6 Cir., 64 F.2d 942, 944.

This brings us, finally, to the question of interest. That item was covered in Sec. 7 of the decree, which, in order to have the problem clearly before us, we quote at length: "7. McLouth shall pay interest upon the amount of royalties aforesaid found to be due at 5 per cent per annum from February 14th, 1940, the date when suit was commenced or due date (whichever is later) less (a) interest on said royalties during the period when McLouth was prevented from paying as a result of action by the United States departments and agencies administering the Royalty Adjustment Act of 1942, namely from August 19, 1943 to January 15, 1945, and (b) interest at 5 per cent on the sum of $90,000 placed on deposit with National Bank of Detroit pursuant to the order of this Court of June 30, 1944, from January 15, 1945, to date of payment, said interest amounting as of November 7, 1946 to * * * ($46,994.69). * * *"

These allowances differed from the Master's recommendations, which awarded interest on the reduced royalties of both the hot and cold mills from the time they fell due. The Master did not consider the effect of the Royalty Adjustment Act of 1942.

 We are in agreement with the conclusion of the court with reference to the hot mill royalties. Correspondence and other evidence indicate that there was a genuine controversy over the performance of the hot mill—the reference to the Master highlighted that disagreement—and we think that the interest allowance properly awaited that determination in the manner indicated by the decree.

 As to the allowance of interest on the cold mill royalties, we have heretofore noted that McLouth acknowledged to the public that it was operating that mill under license. The mill operated efficiently, —there is no dispute about that. The rates were fixed in the license and the due dates were known. We see no reason to defer the running of the interest on those items until the beginning of the law suit. All interest on cold mill royalties should run from their due dates.

 Nor do we see any reason, under the Royalty Adjustment Act, 35 U.S.C.A. § 89 et seq., for suspending interest on the royalties between the dates indicated. There is nothing in the Act to show that its effect was retroactive, and there is no apparent reason for suspending interest on royalties which by the formula we have indicated were fixed, or became due, prior to the operation of the Act on August 19, 1943.

 Nor do we see the rationale of deducting 5% interest on the $90,000 deposit. This, as we understand, was a deposit of bonds, not of cash. McLouth collected such return as became due thereon.

With the exceptions indicated, the judgment of the District Court is affirmed. As to the interest items noted, the cause is reversed and remanded for further proceedings in conformity herewith.